# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | |
| **KRISTIN M. PRICE** | : | **Chapter 7** |
| | : | |
| **Debtor** | : | **Bky. No. 15-17645 ELF** |
| | : | |
| **KRISTIN M. PRICE,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BETSY DEVOS, SECRETARY,** | : | **Adv. No. 16-0011** |
| **UNITED STATES DEPARTMENT** | : | |
| **OF EDUCATION** | : | |
| | : | |
| **Defendant** | : | |

# O P I N I O N

## I.   INTRODUCTION

## II.   PROCEDURAL HISTORY

## III.   FACTS

### A.  The DOE and Chase Student Loan Debts

### B.  The Debtor's Education

### C.  The Debtor's Family

### D.  The Debtor's Employment

### E.  The Debtor's Current Income and Expenses

#### 1.  Monthly Income

    2.  Monthly Expenses

F.  Other Facts Affecting the Debtor's Current Financial Status

G.  Repayment of the Student Loans


IV.  DISCHARGEABILITY UNDER 11 U.S.C. §523(a)(8)

A.  Statutory Authority Governing the Discharge of Student Loans

B.  The Test for "Undue Hardship"


V.  DISCUSSION: THE FIRST TWO <u>BRUNNER</u> PRONGS

A. The First Prong

    1. minimal standard of living

    2. DOE's waiver

    3. the Debtor met her burden of proof

B. The Third Prong: Good Faith Attempt to Repay


VI.  DISCUSSION: THE SECOND <u>BRUNNER</u> PRONG

A.  General Principles

B.  The "Persistence" Element of the <u>Brunner</u> Second Prong

    1. factors and nature of the inquiry

    2. the Debtor met her burden of proof

C.  The "Duration" Element of the <u>Brunner</u> Second Prong: "A Significant Portion the Repayment Period"

    1. the parties' positions on the length of the repayment period

    2. consideration of <u>Brunner</u> in its historical context

    3. determination of the repayment period

**4. determining a "significant portion" of the repayment period – case-by-case**

**5. the Debtor met her burden of proof**

**VII. CODA**

**VIII.  CONCLUSION**

## I.  INTRODUCTION

In this adversary proceeding, Debtor Kristin M. Price ("the Debtor") seeks a determination that her student loan debt to the United States Department of Education ("the DOE") is dischargeable under 11 U.S.C. §523(a)(8).  Under §523(a)(8), student loan debt is dischargeable only if repayment of the debt would impose an "undue hardship" on the debtor and the debtor's dependents.

This Circuit employs what is known as the "Brunner" test for determining undue hardship under §523(a)(8).  See In re Faish, 72 F.3d 298, 306 (3d Cir. 1995) (following Brunner v. N.Y. State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir. 1987)).  The Brunner test requires a debtor seeking to discharge her student loans to prove that:

> (1) based on current income and expenses, the debtor cannot maintain a "minimal" standard of living for herself and her dependents if forced to repay the loans;
>
> (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for the student loans; and
>
> (3) the debtor has made a good faith effort to repay the loans.

Faish, 72 F.3d at 304-05 (quoting Brunner, 831 F.2d at 396).

In this case, the immediate cause of the Debtor's financial difficulties that led to her bankruptcy filing was a marital separation (which will lead to a divorce), which has left her as the sole custodian of three (3) young children, with reduced income for her family's support.

As detailed below, several factors complicate the application of the Brunner test in this adversary proceeding:

- the DOE does not dispute that, presently, the Debtor cannot repay the subject loan while maintaining a minimal standard of living for herself and her three (3) children, thereby satisfying the first Brunner prong;

- there is no dispute that the Debtor has acted in good faith, thereby satisfying the third Brunner prong;

- the Debtor is relatively young and healthy, but works only part-time due to structural obstacles in the labor market in her professional field (vascular sonography);

- the Debtor may be eligible for an income-based, long term extension of the repayment period for her loan, but, in good faith, has elected not to enter such a program;

- in light of the Debtor's qualifications and license as a vascular sonographer and the fact that her children will become adults and responsible for their own support, the Debtor will likely have the ability to make repayments on the subject student loan, while maintaining a minimal standard of living at some eventual point in the future;

- the parties dispute whether the second Brunner prong should be applied by evaluating the Debtor's future prospects within the remaining seven (7) year term of the Debtor's loan or a substantially longer time frame based on a potentially available income-based, extended term loan repayment program.

The facts of this case and the legal issues presented have necessitated a close examination of the second prong of the Brunner test.  As explained below, I conclude that:

(1) in applying the second prong of the Brunner test, which requires that the court consider whether a debtor's current financial difficulties will persist for some period of time, the time period to be considered is not open-ended and courts

-4-

should limit that period of time, as stated in <u>Brunner</u>, to "a significant portion of the repayment period;"

(2) in this case, the "repayment period" under the second prong of <u>Brunner</u> is the seven (7) year repayment period remaining on the Debtor's loan, not the twenty (20) or twenty-five (25) year repayment period potentially available in income-based, extended repayment period programs; and

(3) based on the factual record in this case, the Debtor's present inability to repay the subject loan while maintaining a minimal standard of living for herself and her children will continue for a significant portion of the seven (7) years remaining in the repayment period of the loan.

Accordingly, repayment of the Debtor's student loan debt to the DOE would impose an undue hardship on the Debtor and her dependents under 11 U.S.C. §523(a)(8) and the debt is dischargeable in this chapter 7 bankruptcy case.

## II.  PROCEDURAL HISTORY

On October 26, 2015, the Debtor filed a voluntary chapter 7 bankruptcy petition in this court.  In her schedules, the Debtor listed student loan debts to two (2) creditors: JP Morgan Chase Bank ("Chase") and the DOE.

On December 4, 2015, the chapter 7 trustee filed a report of no-assets.  (Bky. No. 15-17645, Doc. # 12).  The Debtor received her chapter 7 discharge on February 4, 2016.  (Bky. No. 15-17645, Doc. # 14).

On January 14, 2016, prior to the entry of the discharge order, the Debtor initiated this adversary proceeding by filing a complaint against Chase and Arne Duncan in his capacity as Secretary of the DOE,[1] seeking a determination that her student loan debts are dischargeable

---

[1]     On February 7, 2017, Betsy DeVos became the Secretary of Education.  The caption in
(continued...)

under 11 U.S.C. §523(a)(8).  The Defendants filed their respective answers to the Complaint on

March 15 and 30, 2016. (Adv. No. 16-011, Doc. #'s 1, 16, 22).

On August 23, 2016, the court denied Chase's motion for summary judgment. Following

a final pretrial conference, trial of the adversary proceeding was scheduled for November 7,

2016.  (Adv. No. 16-011, Doc. #'s 33, 39).

On November 4, 2017, with the DOE's consent, the Debtor and Chase stipulated to

Chase's dismissal from this action.  (Adv. No. 16-011, Doc. # 41).

Trial of this adversary proceeding was held and concluded on November 7, 2016.  Two

(2) witnesses testified at trial: the Debtor and Phillippe Guillon, a DOE representative.  The

parties submitted eight (8) joint exhibits by agreement.

After the trial, the Debtor and the DOE submitted post-trial briefs in support of their

respective positions, the last of which was filed on January 12, 2017.  (Adv. No. 16-011, Doc. #'s

44, 48).


### III.  FACTS

Set forth below are my findings of fact.  In making these findings, I have considered the

credibility and demeanor of the trial witnesses, the plausibility of their testimony, the existence of

corroborating circumstantial, testimonial or documentary evidence and the totality of the

evidentiary record.

---

[1](...continued)
this case has been corrected accordingly.  See Fed. R. Bankr. P. 7025 (incorporating Fed. R. Civ. P.
25(d)).  For ease of reference, I will refer to this Defendant as the DOE.

## A.  The DOE and Chase Student Loan Debts

1.    As of the trial date, the Debtor was twenty-nine (29) years old with no health problems.

(Joint Pretrial Statement, Statement of Uncontested Facts ¶1) (hereinafter "JPS Facts").

2.    The Debtor attended Thomas Jefferson University and graduated in 2011.  (JPS Facts ¶¶2, 3;

A.T. at 10:03).[2]

3.    The Debtor financed her education through various student loans, some private and some

federally guaranteed.  (JPS Facts ¶2).

4.    The Debtor owes the DOE $25,971.85 on her government guaranteed student loans, with

interest accruing on the principal at the rate of $4.72 a day.  (Id. ¶4).[3]

5.    The debt arises from four (4) loan disbursements of $5,500, $7,000, $7,000 and $5,500.00

respectively.  (Ex. J-7, at USA 00074, 00080).

6.    Based on the repayment schedule in existence at the time the Debtor ceased making

payments in November 2015, the DOE debt was scheduled to be paid off in November

2024.  (JPS Facts ¶¶5, 6).[4]

---

[2]        The term "A.T." refers to the "audio transcript" of the trial held on November 7, 2016.
The numerical references are to the time of day of the cited testimony or statement of counsel.

[3]        Ex. J-7 sets forth slightly different amounts: principal of $25,526.87, accrued interest of
$1,526.17 as of November 3, 2016, for a total debt as of that date of $27,054.03.  Neither party asks that
JPS Facts ¶4 be disregarded in favor of Ex. J-7.

[4]        The record is not explicit on this point, but in light of the fact that the Debtor graduated
in 2011 and that the standard repayment period is ten (10) years, and taking into account that there may
have been an initial grace period of some months before the first repayment fell due, I infer that there
were payment deferments that pushed back the end date of the loan term.  (See Ex. J-7, at USA 00062).

7.   The monthly payment on the debt is in the range of $277.00 to $284.00 per month.[5]

8.   The Debtor also is obligated on two (2) student loans owed to Chase in the combined

amount of $30,470.52.  (Id. at ¶¶7, 9, 12).

9.   The Debtor's monthly payment on the Chase loans is $273.00.  (Id. ¶¶8, 10).

10.  When the Debtor filed this bankruptcy case, she was obligated to pay approximately $500.00

per month on account of her two (2) student loan debts to the DOE and Chase.


## B.  The Debtor's Education

11.   The Debtor earned a Bachelor of Science in Radiologic Science from Thomas Jefferson

University in 2011.  (Id. ¶3).

12.  The Debtor's degree qualified her to take the licensing board examinations for both vascular

and general sonography.  (A.T. at 9:45-9:46, 10:22).

13.  The Debtor passed her licensing board examination for vascular sonography in 2013.  (Id.).

---

[5]       This finding is an approximation because, quite surprisingly, neither party presented any comprehensible evidence regarding the amount of the contractual monthly payment on the DOE debt (or, for that matter, the amount of the monthly payment under either of the potential income contingent repayment programs available to the Debtor).

The parties did introduce into evidence a lengthy exhibit consisting largely of computer printouts which are unintelligible without accompanying explanatory testimony.  (See Ex. J-7).  Ex. J-7 does include two (2) exhibit pages that suggest that the student loans consisted of four (4) discrete disbursements, each with its own interest rate, as follows: 4.25%, 6.55%, 6.55% and 5.35%.  (See id. at USA 00003, 00032).

The range of monthly payments in Finding of Fact No. 7 is derived from calculating the payment amount on a loan of $25,000.00, to be repaid over 10 years (120 months) at "blended" rate of either 6% or 6.6%.  I used the lower end of 6% as a kind of rough blend of the four (4) original interest rates.  In a second computation, which generated the upper end of the range stated in Finding of Fact No. 7, I  used an interest rate of 6.6% because that appears to the rate presently being applied and that results in the stipulated per diem interest of $4.72 on the stipulated unpaid balance of $25,971.85, see Finding of Fact No. 4.  ($4.72 x 365 divided by $25,971.85 = 6.6%).

14. The Debtor did not pass her licensing board examination for general sonography. (Id.).

15. As of the trial date, the Debtor was not eligible to retake the general sonography boards without additional schooling, which might require attendance at a twelve (12) month full-time program. (Id.; Ex. J-4, at 41)).

### C. The Debtor's Family

16. The Debtor is married, but has been separated from her husband since August 2015, and believes there is no chance of a marital reconciliation. (JPS Facts ¶15; A.T. at 9:47).

17. The Debtor resides with her three (3) children, ages three (3), five (5) and eleven (11). (JPS Facts ¶16).

18. Based on financial considerations, the Debtor expects to remain married for the immediate future. (A.T. at 10:31).

19. Due to the lack of a suitable, permanent residence, the Debtor's husband does not take on day-to-day child-care responsibilities. (Id. at 9:49, 10:02, 10:27).

20. The Debtor's oldest child attends public school. (Id. at 9:52, 10:09-10:18).

21. Her middle child is in day care, but next year will begin half-day kindergarten at the public school. At that time, the Debtor will incur expenses for both before-school-care and after-school-care. (Id.).

22. The Debtor's youngest child is in day care and will begin half-day kindergarten in September 2018. At that time, the child also will need before-school-care and after-school-care. (Id.).

### D. The Debtor's Employment

23. The Debtor has been employed by Main Line Health, part-time, for three (3) years, as a

vascular sonographer.  (JPS Facts ¶¶21, 22).

24. The Debtor is paid hourly at the rate of $34.22/hour, working two (2) full days (7:30 a.m. to

4:00 p.m.) and one (1) half day per week, for a total of twenty (20) hours per week.  The

Debtor is also on-call, but has only been called in for extra hours three (3) times since she

began working for her current employer.  (A.T. at 9:59, 10:06-10:08, 10:11-10:12; see also

JPS Facts ¶¶31, 32).

25. The Debtor's qualifications do not permit her to work in areas of sonography other than

vascular sonography.  (A.T. at 9:45).[6]

26. The Debtor has looked for additional hours or a full-time position in her field in the nearby

area, but no such position is available.  (Id. at 9:48, 9:55-9:59).

27. The current full-time vascular sonographers at Main Line Health are not due to retire for

eight (8) years.  (Id. at 10:20, 10:36).

28. The Debtor has not sought lower-paying, part-time employment outside of her field.[7]

---

[6]      The Debtor does not know if her qualifications permit her to work in vascular
sonography outside of Pennsylvania.  (A.T. at 9:57).

[7]      The Debtor testified that she has considered seeking additional employment in other
fields (such as retail or food service) to supplement her part-time income, but has ruled it out because she
believes her earnings would not cover the additional childcare costs.  (A.T. at 10:09).  She estimated that
full-time day care would cost her an additional $600.00 a month.  (Id. at 9:52).

        It is not obvious that the Debtor is entirely correct in her belief that working part-time
outside her field in an entry-level type job would provide her with no net income after childcare
expenses.  But, it is reasonable for her to believe that any additional net income is not significant or
material.

        Assuming a marginal tax rate of thirty percent (30%) and a (perhaps overly optimistic)
wage rate of fifteen dollars ($15) per hour, by working an additional twenty (20) hours per week, the
Debtor would make $1,200.00 per month gross and $840.00 per month net.  After paying her increased
day care costs, she would net less than $300.00 per month over her current earnings.  While it is likely
that such employment would result in some additional expenses (e.g., transportation), the Debtor

(continued...)

## E.  The Debtor's Current Income and Expenses

### 1.  Monthly Income

29.  The Debtor's gross monthly income is $3,455.83.  After payroll deductions, her monthly

take-home pay is $2,405.00.  (JPS Facts ¶23).

30.  The Debtor receives child support from her husband in the amount of $1,400.00 per month.

(Id. ¶24).[8]

31.  In addition, the Debtor's husband directly pays $507.05 toward certain of the Debtor's

expenses (automobile loan; auto and renter's insurance).  (Id. ¶27).[9]

32.  These sources result in $4,312.00 available for payment of the living expenses of the Debtor

and her three (3) children.

### 2.  Monthly Expenses

33.  The Debtor's monthly expenses exceed her income and total $4,482.00 as follows:

| | |
|---|---|
| $1,400.00 | rent |
| $ 230.00 | heat and electricity |

---

[7](...continued)
nonetheless would likely end up with some additional net income.  That additional net income
appropriately would be applied to the Debtor's already negative monthly balance for her regular expenses
as described in the text infra.  Therefore, this potential income is not particularly relevant with respect to
her potential for repayment of the DOE student loan.

[8]      The Debtor's husband works as a lineman for Amtrak.  (A.T. at 9:49).

[9]      I infer that the support payments are entirely voluntary and consensual between the
parties.  There is nothing in the record that suggests whether the Debtor's husband's level of support
(both direct and indirect) is more or less generous than the amount to which the Debtor would be entitled
under Pennsylvania law.  See generally  23 Pa.C.S.A. § 4322(a) ("Child and spousal support shall be
awarded pursuant to a Statewide guideline as established by general rule by the Supreme Court").

|  |  |
|---|---|
| $ 30.00 | water |
| $ 240.00 | cable, phone and internet |
| $ 45.00 | cell phone |
| $ 800.00 | food and household supplies |
| $1,127.00 | childcare and after school activities[10] |
| $ 150.00 | clothing |
| $ 80.00 | personal care products |
| $ 50.00 | out of pocket medical expenses |
| $ 250.00 | gas and car maintenance |
| $ 80.00 | entertainment |
| Total      $4,482.00 [11] | |

34. The Debtor's monthly expenses exceed her monthly income.

### F. Other Facts Affecting the Debtor's Current Financial Status

35. The Debtor owns no real estate. (JPS Facts ¶17).

36. The Debtor lives in a home owned by her mother, and pays her mother a below-market

    monthly rent of $1,400.00, which covers her mother's mortgage payments on the property.

    (A.T. at 9:50).

37. The Debtor's mother provides free childcare for the oldest child when he returns from school

    on the days that the Debtor is working. (Id. at 10:10).

38. The Debtor's car is leased, with two (2) years remaining on the lease. The Debtor's husband

    has promised to make monthly payments on a new car and cover the insurance as well in two

    (2) years when the leased car needs to be replaced. (Id. at 10:01, 10:27-10:28).

---

[10]     The amount the Debtor pays for childcare does not cover all of her childcare needs. On the days that she is working, her mother provides free childcare in the afternoon. (A.T. at 10:10).

[11]     At trial, the Debtor testified that she will not be making any more payments on the student loans owed to Chase. (A.T. at 9:39). As a result, I have not treated that loan as a monthly expense.

-12-

39.  The Debtor lacks sufficient cash flow to pay all of her monthly expenses.  She manages the

shortfall by taking loans from her mother, which she repays from her income tax refund.  (Id.

at 9:52-9:53).[12]

40.  The Debtor owns no property other than the modest amount of exempt cash, cash equivalents

and personal property listed in Schedule B of her bankruptcy schedules.  (JPS Facts ¶19).[13]


## G.  Repayment of the Student Loans

41.  During the pendency of this adversary proceeding, the Debtor settled with Chase and will not

be making monthly payments on the loans to Chase.  (A.T. at 9:40).

42.  The DOE offers two (2) repayment plans that are available to the Debtor: Income-Based

Repayment ("IBR") and Revised Pay As You Earn ("REPAYE").  Both plans are keyed to a

borrower's income.  (Id. at 11:00).

43.  The DOE measures the borrower's discretionary income available for repayment of the loan

by reference to the difference between:

> (a) the Adjusted Gross Income stated on the federal income tax return of those in
> the borrower's household and

---

[12]      The Debtor is unsure whether she and her husband will continue to file a joint tax return
Therefore, her income tax refund may decrease.  (A.T. at 9:53, 10:24).  It is also legitimate to wonder
whether the Debtor's husband will follow through on his good intentions and actually pay the lease or
purchase expenses as well as the insurance costs of a replacement for the Debtor's current, leased car.


[13]      On Schedule B, the Debtor disclosed ownership of some cash, a checking account, used
household goods, used clothing, jewelry (earrings and wedding band), term life insurance and a §403(b)
retirement account.  The total value of these assets was $10,504.00.  The retirement account constituted
more than one-half (½) of the total value of the assets.

       (b) 150% of the federal poverty level for a household containing the appropriate
number of dependents in the borrower's household.

See 20 U.S.C. §1087e(e); 34 C.F.R. §§685.209(c)(2)(i), 685.221(b)(1).[14]

44. Under the IBR plan, a borrower must pay fifteen percent (15%) of their monthly disposable

income for twenty (20) years.  Any loan balance which is unpaid at the end of the repayment

term is forgiven.  (A.T. at 11:10; 34 C.F.R. §685.221(b)(1)).

45. Under the REPAYE plan, a borrower must pay ten percent (10%) of their monthly

discretionary income for twenty-five (25) years.  To qualify for REPAYE, the borrower must

consolidate all federal loans, which will result in the capitalizing of any accrued interest and a

new interest rate equal to the average of the prior rates.  (A.T. at 11:16; 34 C.F.R.

§685.209(c)(2)(i)).

46. The DOE recognizes that the consolidation of loans and capitalization of accrued interest

requirement is a materially unfavorable feature of the REPAYE program.  (A.T. at 11:16).

47. As long as a borrower's monthly income is below 150% of the poverty line for a household

of the appropriate size, the monthly payment under either plan will be $0.00.  (Id. at 11:11).

48. Under both the IBR and REPAYE plans, any loan balance which is unpaid at the end of the

repayment term is forgiven, which may result in cancellation of indebtedness income for the

borrower and a resulting income tax liability (on what is sometimes referred to colloquially as

"phantom income").  (See id. at 11:06).

---

[14]     The DOE's witness, Mr. Guillon, testified regarding the characteristics of the IBR and
PAYE programs.  His testimony was largely, but not entirely, consistent with the factual findings on the
subject in the text.  Rather than rely exclusively on his testimony, I also cite the federal regulations upon
which his testimony appears to be based.

-14-

49.  The Debtor explored repayment plans offered by the DOE by attempting to set up a

repayment plan online.  She did not complete the process after she realized she could not pay

the lowered monthly payment.  (Id. at 9:53, 10:32-10:33).[15]

50.  No evidence was presented regarding the precise amount of the monthly payment under

either of the income contingent repayment plans for which the Debtor may be eligible.


### IV.  DISCHARGEABILITY UNDER 11 U.S.C. §523(a)(8)

### A.  Statutory Authority Governing the Discharge of Student Loans

Congress has excluded certain educational loans from the general chapter 7 bankruptcy

---

[15]        The Debtor's testimony suggests, and there is nothing in the record to contradict her, that her adjusted gross income exceeds 150% of the applicable federal poverty level.  Thus, based on DOE's formula, she would be obliged to make monthly payments under either of the income contingent repayment plans.  Perhaps this is because she and her husband filed a joint tax return while separated.  In any event, her actual living expenses, as set forth in her bankruptcy schedules, exceed her income available for the expenses and the DOE has not disputed that the Debtor presently could not maintain a minimal standard of living for herself and her children if she made monthly payments on her student loan.

The DOE's use of the Debtor's adjusted gross income from a joint tax return filed by her and her separated spouse tends to misleadingly inflate her ability to repay her loan and reduce her ability to obtain cash flow relief under the income contingent repayment programs.  Perhaps the DOE can adjust the Debtor's treatment under these repayment programs in light of her marital separation.  However, the record was not developed on this point.

I also point out an apparent anomaly or inconsistency in federal policy.  The DOE income contingent repayment plan regulations suggest that once adjusted gross income exceeds a certain threshold, the borrower must make a monthly repayment.  (The DOE regulations' methodology seem roughly analogous to bankruptcy "means testing," in which historical income data is compared to fixed expense standards to measure an individual's presumptive prospective ability to pay).  However, in the dischargeability context under the Bankruptcy Code, as implemented through the Brunner test, courts evaluate the debtor's ability to maintain a minimal standard of living (i.e., prong one (1) of Brunner) by measuring actual, current income against judicially determined minimal expenses on a case-by-case basis.  In this litigation, the DOE has accepted the bankruptcy methodology insofar as it has not disputed the Debtor's satisfaction of prong one (1) under Brunner.

-15-

discharge.  Section 523(a)(8) of the Bankruptcy Code provides:

> (a) **A discharge under section 727 . . . of this title does not discharge** an individual debtor from **any debt** --
>
>> (8) **unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents**, for –
>>
>>> (A)(i) **an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or part by a governmental unit** or nonprofit institution; or
>>>
>>> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>>>
>>> (B) any other education loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual . . . .

11 U.S.C. §523(a)(8) (emphasis added); see also 11 U.S.C. §§1141(d)(2), 1228(a)(2), 1328(a)(2), (c).

In this adversary proceeding, it is undisputed that the Debtor's DOE student loans constitute the sort of educational debt obligation encompassed by §523(a)(8)(A)(i).  Accordingly, the loans are nondischargeable unless the Debtor proves that repayment would "impose an undue hardship on the debtor and the debtor's dependents."  11 U.S.C. §523(a)(8).


### B.  The Test for "Undue Hardship"

The Bankruptcy Code does not define the "undue hardship" standard.  Since 1995, the law in this Circuit has been that "undue hardship" is evaluated by applying the Brunner test.  See Faish, 72 F.3d at 306.

-16-

The <u>Brunner</u> framework is "the definitive, exclusive authority that bankruptcy courts must utilize to determine whether the 'undue hardship' exception applies." <u>Id.</u>  In other words, "[e]quitable concerns or other extraneous factors not contemplated by the <u>Brunner</u> framework may not be imported into the court's analysis to support a finding of  dischargeability." <u>Id.</u>

I have previously analyzed the <u>Brunner</u> framework as follows:

> Under the first prong of <u>Brunner</u>, the court must examine the debtor's current financial condition to see if payment of the loans would cause his standard of living to fall below that minimally necessary. [S]atisfying this prong requires more than a showing of tight finances.
>
> The second prong of the <u>Brunner</u> test requires the debtor to prove that there are additional circumstances that indicate that [the] state of affairs is likely to persist for a significant portion of the repayment period of the student loans.  To this end  . . .   a student loan may not be discharged based **simply** on a present inability to fulfill [the] financial commitment.
>
> The third prong of <u>Brunner</u> requires an examination of the debtor's good faith.  This inquiry is to be guided by the understanding that undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control.
>
> All three elements must be satisfied individually before a discharge can be granted.  If any one of the <u>Brunner</u> requirements is not satisfied, the bankruptcy court's inquiry must end there, with a finding of no dischargeability.

<u>In re Miller</u>, 409 B.R. 299, 309 (Bankr. E.D. Pa. 2009) (emphasis in original) (quotations and citations omitted).

A debtor seeking to discharge student loan debt falling within the purview of §523(a)(8) bears the burden of establishing that excepting that debt from discharge will cause the debtor and his or her dependents "undue hardship."  <u>See</u> <u>Faish</u>, 72 F.3d at 305-06; <u>In re Zierden-Landmesser</u>, 249 B.R. 65, 69 (Bankr. M.D. Pa. 2000).

The §523(a)(8) discharge exception is designed to effectuate two (2) distinct purposes: (1) preventing abuses of the educational loan system by restricting the ability to discharge a student loan shortly after a student's graduation; and (2) safeguarding the financial integrity of governmental entities and nonprofit institutions that participate in educational loan programs. E.g., 4 Collier on Bankruptcy ¶523.14[1] (Alan N. Resnick, Henry J. Sommer eds., 16th ed. 2017); In re Doernte, 2017 WL 2312098, at *1 (Bankr. W.D. Pa. May 25, 2017).

## V. DISCUSSION: THE FIRST AND THIRD BRUNNER PRONGS

### A. The First Prong

#### 1. minimal standard of living

Under the first prong of the Brunner test, the Debtor must show she cannot maintain a minimal standard of living for herself and her dependents if required to repay her student loans. Educ. Credit Mgmt. Corp. v. Polleys, 356 F.3d 1302, 1310 (10th Cir. 2004). This minimal standard of living should be applied flexibly according to the specific needs and life situation of the particular debtor. See Faish, 752 F.3d at 305-06 (rejecting a "mechanical approach" based on federal poverty guidelines).

A minimal standard of living does not mean that the debtor must live in poverty.[16] Rather, a minimal standard of living involves the elimination of extraneous or luxury expenses, the paring

---

[16]     E.g., In re Hornsby, 144 F.3d 433, 438 (6th Cir. 1998); Doernte, 2017 WL 2312226, at *4-5; In re Alston, 297 B.R. 410, 415 (Bankr. E.D. Pa. 2003); see also In re Hedlund, 368 F. App'x 819, 821 (9th Cir. 2010) (nonprecedential); In re Lokey, 98 F. App'x 938, 941 (4th Cir. 2004) (nonprecedential).

down of a debtor's expenditures to cover basic needs, while maximizing income. The minimal

standard of living contemplated by 11 U.S.C. §523(a)(8) permits expenditures which are not

absolutely necessary for survival, but are part of living a life of basic human dignity. See In re

Ivory, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001) ("People must have the ability to pay for some

small diversion or source of recreation, even if it is just watching television or keeping a pet").


### 2. the DOE's waiver

At trial, the DOE stated that it was not contesting the first prong of Brunner, and limited

the trial to the issues under the second prong. (A.T. at 9:41). In its post-trial brief, while the DOE

made no argument that the Debtor did not meet her burden on the first prong, it was slightly

equivocal, stating only that it was "[a]ssuming without deciding" that the Debtor has a current

inability to pay the student loan. (DOE Post-Trial Brief at 4) (Doc. # 48).

On this record, I conclude that the DOE conceded at trial that the Debtor has satisfied the

first prong of Brunner. See Guffey v. A.W. Chesterton Co., 2012 WL 5395021, at *1 & n.1 (E.D.

Pa. Aug. 29, 2012).


### 3. the Debtor met her burden of proof

In case there is any doubt regarding DOE's trial concession regarding the first prong, I

find, independently, that the Debtor met her burden of proving that she currently cannot maintain

a minimal standard of living for herself and her dependent children. The evidentiary record on the

first Brunner prong consists of the undisputed facts in the Joint Pretrial Statement, which were

largely restated by the Debtor at trial, regarding the nature and amount of her income and living

-19-

expenses.

The record establishes that the Debtor's net monthly income, from her part-time

employment and support from her estranged spouse (including his direct payment of certain

expenses), totals just under $4,500.00. This income comes close, but does not quite cover all of

her family's living expenses. The problem is exacerbated by a cash flow problem arising from the

Debtor's practice (a common one in our society), of having her employer deduct more from her

paycheck than her eventual income tax liability. The Debtor's mother covers the Debtor's budget

shortfall and cash flow difficulties by providing below-market rent on the Debtor's residence and

short-term financial assistance when needed.

The Debtor's bare-bone expenses cover basic needs: rent, utilities, food, communication,

childcare, clothing, transportation. She allocates a meager amount for entertainment: $80.00 a

month for a family of four (4). There are no vacations in this budget. There are no savings for the

children's post-secondary school educational expenses. There are no savings (or payroll

deductions) for the Debtor's eventual retirement. The DOE has not suggested that there are any

expenses that are subject to a reasonable reduction and I, too, perceive none.[17] If the Debtor were

to make a monthly payment on her student loan, she and her children undoubtedly would be

---

[17]     The DOE does point out that the Debtor's income level places her above the federal
poverty level. (DOE Post-Trial Brief at 2). This is accurate. See 82 Fed. Reg. 8831-03, 2017 WL
395763 (Jan. 31, 2017). However, that is beside the point.

As stated earlier, the concept of a minimal standard of living does not equate to living at
the poverty level. See Part V.A.1., supra. Indeed, the federal poverty guidelines have been criticized as
being understated and based on an outdated methodology. See Natilia A. Kolesnikova, Yank Liu,
Understanding Poverty Measures and the Call to Update Them, The Regional Economist (Federal
Reserve Bank of St. Louis, July 2012) (available at
https://www.stlouisfed.org/publications/regional-economist/july-2012/understanding-poverty-measures-a
nd-the-call-to-update-them).

unable to pay for some expense necessary to maintain a minimal standard of living.

This state of affairs is enough to satisfy the first prong of <u>Brunner</u>.  The Debtor and her

children subsist at a minimal standard of living and there is no room in the Debtor's budget for a

student loan repayment. "Where a family earns a modest income and the family budget, which

shows no unnecessary or frivolous expenditures, is still unbalanced, a hardship exists from which

a debtor may be discharged of his student loan obligations." <u>Hornsby</u>, 144 F.3d at 438 (quoting <u>In

re Correll</u>, 105 B.R. 302, 306 (Bankr. W.D. Pa. 1989)).


### B. The Third Prong: Good Faith Attempt to Repay

The DOE concedes that the Debtor met the third prong of <u>Brunner</u>.  (A.T. at 9:41).  I

agree.  Under the third prong of <u>Brunner</u> the Debtor is required to establish that she made a "good

faith effort to repay the loans." <u>Brunner</u>, 831 F.2d at 396.  A debtor must show that he or she is

seeking a discharge on a legitimate basis and has not manufactured his or her hardship.  <u>Polleys</u>,

356 F.3d at 1310.

In examining the third prong, courts consider:

> 1) whether the debtor has made any payments on the loan prior to filing for
> discharge, 2) whether the debtor has sought deferments or forbearances, 3) the
> timing of the debtor's attempt to have the loan discharged, and 4) whether the
> debtor's financial condition resulted from factors beyond her reasonable
> control, as a debtor may not willfully or negligently cause her own default.

<u>In re Roth</u>, 490 B.R. 908, 917 (B.A.P. 9th Cir. 2013) (citations omitted).

A debtor's efforts to make loan repayment less onerous are an important part of the good

faith analysis.  <u>In re Mosko</u>, 515 F.3d 319, 326 (4th Cir. 2008).  As such, the availability of

income-based repayment plans is a factor to be considered.  <u>In re Crawley</u>, 460 B.R. 421, 444-45

(Bankr. E.D. Pa. 2011) (citing authorities).  However, debtors are not required to enter a

repayment plan.  E.g., Roth, 490 B.R. at 917 (citing Educ. Credit Mgmt. Corp. v. Jorgensen (479

B.R. 79, 89 and n. 4 (9th Cir. 2012)).  Debtors can begin negotiations to enter a repayment plan

and still abandon those negotiations in good faith based upon the consequences of the plan.  In re

Barrett, 487 F.3d 353, 364-65 (6th Cir. 2007) (good faith found when debtor failed to enroll in

income-based plan based upon future tax liability resulting from the plan).

        Staying current on student loan payments until the filing of a bankruptcy petition is an

effective means of demonstrating good faith.  Here, the Debtor was current on all of her student

loans owed to the DOE for some period of time, up until November 11, 2015.  (JPS Facts ¶6).

While the parties have not fleshed out the record on this point, considering that the Debtor

graduated from Thomas Jefferson University in 2011, even taking into account the likelihood that

there was period of payment forbearance, it also seems clear that the there was also a period of

time in which the Debtor made her loan repayments.[18]

        Further, in this case, the Debtor looked into the possibility of entering an income-based

repayment plan.  She engaged the DOE's website and began the process of applying for a more

suitable repayment plan.  She did not complete her application because she realized that under any

available plan she would be obliged to make a monthly payment that she could not afford. (A.T. at

9:53).  See Finding of Fact No. 49 & n.15, supra.  What would be the point of entering into an

"affordable" repayment plan, if a default shortly thereafter appears inevitable due to insufficient

---

[18]        I cannot be precise because the record is not developed regarding the date the loan
repayments first fell due and how many payments the Debtor made. Ex. J-7 seems to have some
information on that subject, as well as some information regarding deferments the Debtor may have
received.  See also n.5, supra.  However, as stated earlier, see n.4, supra, Ex. J-7 is largely indecipherable
without accompanying testimony.

income?  Simply put, it is not bad faith to investigate the terms of a payment plan, but to abandon further consideration of the plan when it is obvious that the plan will not permit the debtor to comply with its terms.

Finally, there is nothing in the record that suggests that the Debtor manufactured her hardship by volitional conduct that reduced her income potential or that inflated her living expenses.  See In re Jones, 392 B.R. 116, 130 (Bankr. E.D. Pa. 2008).  Her financial difficulties are entirely involuntary.


## VI. DISCUSSION: THE SECOND BRUNNER PRONG

### A.  General Principles

The battle line in this case is drawn over the second prong of Brunner.

The second Brunner prong requires a debtor to show that "additional circumstances exist indicating that the inability to repay the student loan without impairing the debtor's minimal standard of living is likely to persist for a significant portion of the repayment period for the student loans."  Brunner, 831 F.2d at 396.

The second prong has two (2) elements:

(1) that the debtor's present financial difficulties are likely to continue and not improve; and

(2) the duration of the debtor's financial hardship will continue "for a significant portion of the repayment period of the student loans."

See Brunner, 831 F.2d at 396; see also Crawley, 460 B.R. at 438.

As with the other parts of the Brunner test, the debtor bears the burden of bringing forth specific facts showing his or her current financial situation will persist.  See, e.g., Barrett, 487

-23-

F.3d at 359; <u>Educ. Credit Mgmt. Corp. v. Curiston</u>, 351 B.R. 22, 32 (D. Conn. 2006); <u>In re Lepre</u>, 466 B.R. 727, 732 (Bankr. W.D. Pa. 2012), <u>aff'd</u>, 530 F. App'x 121 (3d Cir. 2013).

The second prong requires courts to project a debtor's future employment opportunities, income and expenses.  <u>Frushour</u>, 433 F.3d 393, 401 (4th Cir. 2005) ("the second <u>Brunner</u> factor is prospective in nature").  This is not easy; courts have lamented the difficulty of forecasting the debtor's future prospects and financial situation.  <u>See</u> <u>Crawley</u>, 460 B.R. at 439 (citing authorities).  The <u>Brunner</u> district court cogently described the difficulty of the court's predictive task under §523(a)(8):

> Predicting the future, however, is never so easy. Minimum necessary future expenses may be ascertained with some precision from an extrapolation of present needs, but unpredictable changes in circumstances such as illness, marriage, or childbirth may quickly wreak havoc with such a budget. Even more problematic is the calculation of future income. It is the nature of §523(a)(8)(B) applications that they are made by individuals who have only recently ended their education. Their earning potential is substantially untested, and because they are inexperienced they are in all likelihood at the nadir of their earning power. They may, like appellee, have had difficulty in securing employment immediately after graduation.

<u>In re Brunner</u>, 46 B.R. 752, 754-55 (S.D.N.Y. 1985).

## B.  The "Persistence" Element of the <u>Brunner</u> Second Prong

### 1. factors and nature of the inquiry

The first element of the second prong requires that the court evaluate the likelihood that the debtor's present financial difficulties will persist.  Whatever the precise factors to be considered may be, it is clear that the inquiry is extremely fact intensive.  <u>Krieger v. Educ. Credit Mgmt. Corp.</u>, 713 F.3d 882, 884 (7th Cir. 2013).

-24-

To aid in this predictive task, a bankruptcy court in this district succinctly summarized the types of circumstances that suggest that the financial difficulties will persist: "long-term physical or mental problems precluding employment, lack of marketable job skills, or the necessity of fully supporting several dependents which precludes sufficient income." In re Sperazza, 366 B.R. 397, 411 (Bankr. E.D. Pa. 2007); accord Brunner, 46 B.R. at 755.

Other courts have developed lengthier, non-exhaustive lists of factors to be considered.

One Court of Appeals identified five (5) relevant factors:

> (1) the debt amount; (2) the interest rate; (3) the debtor's claimed expenses and current standard of living to evaluate whether the debtor has attempted to minimize expenses; (4) the debtor's income, earning ability, health, education, dependents, age, wealth, and professional degrees; and (5) whether the debtor has attempted to maximize income by seeking or obtaining employment commensurate with her education and abilities.

In re Oyler, 397 F.3d 382, 385 (6th Cir. 2005) (citing In re Miller, 377 F.3d 616, 623 (6th Cir. 2004)).

Another Court of Appeals set out a twelve (12) factor test:

> (1) Serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement; (2) The debtor's obligations to care for dependents; (3) Lack of, or severely limited education; (4) Poor quality of education; (5) Lack of usable or marketable job skills; (6) Underemployment; (7) Maximized income potential in the chosen educational field, and no other more lucrative job skills; (8) Limited number of years remaining in [the debtor's] work life to allow payment of the loan; (9) Age or other factors that prevent retraining or relocation as a means for payment of the loan; (10) Lack of assets, whether or not exempt, which could be used to pay the loan; (11) Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income; (12) Lack of better financial options elsewhere.

In re Nys, 446 F.3d 938, 947 (9th Cir. 2006) (quoting In re Nys, 308 B.R. 436, 443-44 (B.A.P. 9th Cir. 2004)).

-25-

The number of reported decisions evaluating the second <u>Brunner</u> prong is vast.

Predictably, the outcomes are varied and turn on the particular factual circumstances of the case.

It is equally clear that no one factor controls.  Debtors with and without college degrees, with and

without medical problems, with and without dependents, with relatively high incomes and with

relatively low incomes have had student loans held dischargeable, while other debtors with similar

profiles have had their student loans held nondischargeable.  See <u>Bankruptcy Discharge of Student</u>

<u>Loan On Ground of Undue Hardship Under § 523(a)(8)(B) of Bankruptcy Code of 1978,</u> 144

A.L.R. Fed. 1, at §§4[a]-13[b] (West 2017) ("A.L.R. Fed.").[19]

---

[19]     The fact intensive nature of the §523(a)(8) inquiry and the varied outcomes suggest that
prior decisions may have diminished value as legal precedent.

> There are many areas of bankruptcy law where Congress apparently intended
> bankruptcy judges to weigh the evidence and utilize their experience and
> judgment to decide individual cases on a case by case basis. It does so by using
> terms that are inherently incapable of fine definition, such as "good faith,"
> "substantial abuse,""undue hardship," and the like. Case law in such areas tends
> to identify "factors" that in reality are merely a checklist of relevant facts or
> issues to consider, none of which is dispositive. Perhaps such areas of
> bankruptcy law are best dealt with as in the civil system, with each judge reading
> and applying the statute and its underlying policies and principles to each factual
> situation that comes up, without regard to what the last judge did on different
> facts. Reported decisions in such areas serve little useful purpose, and in fact
> may be counterproductive.

In re Crater, 286 B.R. 756, 772 (Bankr. D. Ariz. 2002) (footnote omitted); <u>see also</u> A. Scalia, <u>The Rule of
Law As a Law of Rules</u>, 56 U. Chi. L. Rev. 1175, 1180–81 (1989) (describing judicial decisions based on
multiple factors as "amount[ing] to not so much pronouncing the law in the normal sense as engaging in
the less exalted function of fact finding").

        I acknowledge that some tension exists between my description of the nature of a
bankruptcy court's undue hardship determination and the Court of Appeals' statement in Brightful that
the undue hardship determination is a legal issue over which an appellate court exercises plenary review.
In re Brightful, 267 F.3d 324, 326-27 (3d Cir. 2001).  However, in at least one (1), subsequent
nonprecedential decision, the court may have softened that stance.  <u>See</u> In re Coco, 335 F. App'x 224, 227
(3d Cir. 2009) (disputed issue of fact precluded summary judgment on good faith prong of <u>Brunner</u> test);
<u>see generally</u> In re Acosta-Conniff, 2017 WL 1396164, at *2 (11th Cir. Apr. 19, 2017) (nonprecedential);
                                                                                          (continued...)

**2. the Debtor met her burden of proof**

In this case, the Debtor does not fit into the most common profile of a debtor entitled to a student loan discharge under §523(a)(8).  She is young and healthy; she completed the schooling for which she incurred her student loans and obtained a professional license in her field; she is employed, albeit only part-time.  All of these factors suggest that her circumstances could improve.

On the other hand, she has three (3) young children and extensive childcare costs.  The childcare costs will rise, at least in the short run, if she works more hours.  Given the age of her children, these childcare costs can be expected to continue for a number of years.  As the children get older and childcare expenses diminish, one can expect that those costs will be replaced commensurately with other child rearing expenses.[20]  Although employment within the Debtor's field would result in increased net income in the near future, there are no additional hours available for her to work in her field.  Nor can she easily expand her licensing credentials to open up other employment opportunities within her field as that would require the investment of additional time and expense for additional schooling.  Furthermore, employment outside her field would result in only a marginal increase in net monthly income.

---

[19](...continued)
Krieger, 713 F.3d at 884 ("the statutory inquiry is 'undue hardship,' a case-specific, fact-dominated standard, which implies deferential appellate review").

[20]    I make this statement by drawing on my own experience and common sense.  See Crawley, 460 B.R. at 437 n.16; accord In re Scott, 417 B.R. 623, 630-31 (Bankr. W.D. Wash. 2009); In re Goranson,183 B.R. 52, 57 (Bankr. W.D.N.Y. 1995).  Contra Educ. Credit Mgmt. Corp. v. Carter, 279 B.R. 872, 878-79 (M.D. Ga. 2002).

On this record, I find that the Debtor has met her burden of establishing the existence of circumstances that satisfy the first element of the second <u>Brunner</u> prong - the likelihood that the Debtor's financial difficulty will persist.  Essentially, the Debtor's unintended and involuntary underemployment, her marital separation and likely eventual divorce,[21] and her obligations as the primary custodian of three (3) young children make it more likely than not that her present financial difficulties will continue – **<u>at least for some period of time</u>**.

Whether that "period of time" is sufficiently lengthy to warrant the discharge of her student loan is the subject of the second element of the second <u>Brunner</u> prong, discussed next.

### C.  The "Duration" Element of the <u>Brunner</u> Second Prong: "A Significant Portion of the Repayment Period"

#### 1. the parties' positions on the length of the repayment period

The second element of the second <u>Brunner</u> prong requires the court to determine if the debtor will remain at the margins of a minimal standard of living "for a significant portion of the repayment period."  <u>Brunner</u>, 831 F.2d at 396.

This second element of the second <u>Brunner</u> prong itself requires two (2) separate inquiries:

(1)  How long is the applicable repayment period?

(2)  What is a "significant portion" of that repayment period (sufficient to warrant discharge of the debtor's student loan)?

The Debtor argues that the repayment period is governed by her current loan contract, which is due to end in 2024, just over seven (7) years after the trial date.  (Debtor's Post-Trial

---

[21]      As I previously noted, <u>see</u> n.12, <u>supra</u>, it is possible the level of support provided by the Debtor's husband may decrease as his duty of providing spousal support is eliminated by divorce or as he otherwise moves on with his life, undertaking new financial obligations.

Brief at 3). The DOE asks this court to consider a repayment period of twenty-five (25) years, the longest repayment plan the Debtor may have under an available income contingent repayment programs.  (DOE Post-Trial Brief at 6).

The parties' concentration on this issue is understandable.  The longer the repayment period, the more difficult the Debtor's evidentiary burden.  It also is possible that a debtor might establish that his or her financial difficulties will not abate for a finite period that constitutes a "significant portion" of the existing contractual repayment period, but that longer term prospects, within a "significant portion" of an available extended repayment period, are more favorable. Thus, the choice of repayment period is potentially outcome-determinative in this and other cases.

### 2. consideration of <u>Brunner</u> in its historical context

Before directly addressing the two (2) issues identified above (the length or the repayment period and the length of a significant portion of the repayment period), it is useful to return to <u>Brunner</u> itself, the decision that, thirty (30) years ago, developed the most widely used test for determining undue hardship under §523(a)(8).  Consideration of <u>Brunner</u> in its historical context assists in the analysis of the second <u>Brunner</u> prong.

In 1987, when <u>Brunner</u> was decided, a student loan could be discharged upon a showing that the loan was in pay status for five (5) years prior to the bankruptcy **or** that repayment would impose an undue hardship on the debtor and the debtor's dependents.  See Pub. L. No. 96-56, §3, 93 Stat. 387, 387 (Aug. 14, 1979).   Thus, at the time, student loan debt was dischargeable simply by virtue of the passage of the requisite time period.  (I will refer to the five (5) year provision of §523(a)(8) as providing for a "temporal discharge").

Also during that time, undue hardship cases arose only if a debtor sought to discharge student loan debt that was in pay status for less than five (5) years. Thus, the "undue hardship" cases coming before the bankruptcy courts in the age of Brunner involved debtors who had only recently graduated and sought to discharge student loan indebtedness after only a brief period of economic difficulty (and, in some cases, without having made any effort to repay the indebtedness). See Roth, 490 B.R. at 921 (Pappas, J., concurring). Indeed, the district court in Brunner described the test it formulated to apply to debtors seeking to "obtain[ ] a discharge of student loan in bankruptcy prior to five years after first become due." Brunner, 46 B.R. at 756. Eight (8) years later, when Brunner was adopted in this Circuit by Faish, the architecture of student loan discharge was essentially the same, the only difference being that the right to a temporal discharge required a waiting period of seven (7) years, rather than five (5) years.

The reported decisions in the Brunner/Faish era regularly referred to the discharge of student loan debts, prior to the temporal waiting period (so soon after the debtor had completed schooling), as a potential "abuse" of the bankruptcy system. See In re Segal, 57 F.3d 342, 348 (3d Cir. 1995) (stating that one of the purposes of §523(a)(8) was "to remedy abuses of the educational loan system by restricting the ability of a student to discharge an educational loan by filing for bankruptcy shortly after graduation").[22] Given the relatively narrow factual parameters of the undue hardship cases of that time, it is therefore not surprising that the Brunner judicial test

---

[22]    See also TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 936 (1st Cir. 1995); Hiatt v. Indiana State Student Assistance Comm'n, 36 F.3d 21, 24 (7th Cir. 1994); In re Cheesman, 25 F.3d 356, 359 (6th Cir. 1994); In re Pelkowski, 990 F.2d 737, 742 (3d Cir. 1993); U.S. Dep't of Health & Human Servs. v. Smith, 807 F.2d 122, 125-26 (8th Cir. 1986).

for measuring "undue hardship" under §523(a)(8) was articulated in a strict fashion.[23]

Several significant changes in the student loan landscape have occurred since Brunner was decided (as well as since Faish).

First, Congress eliminated the temporal discharge in bankruptcy for student loans. Initially, in 1990, Congress extended from five (5) to seven (7) years the "in pay status" requirement of the §523(a)(8) temporal discharge.  See Pub. L. No. 101-647, §3621, 104 Stat. (Nov. 29, 1990).   This was the state of the law when Faish made the Brunner test binding precedent in the Third Circuit.   Then, in 1998, Congress repealed the seven (7) year temporal discharge provision in its entirety, leaving undue hardship as the only basis for discharge.  See Pub. L. No. 105-244, § 971, 112 Stat. 1581, 1837 (1998).

A second development in the student loan environment was the creation of longer term, income contingent repayment programs for student loans, extending what typically was a ten (10) year loan term[24] in 1987 to as much as twenty (20) or twenty-five (25) years.[25]  These programs,

---

[23]     I do not mean to suggest that curbing bankruptcy abuse was the sole purpose of §523(a)(8). As previously mentioned, a second purpose of the discharge exception is to protect the solvency of the of educational loan programs.  E.g., Pelkowski, 990 F.2d at 743.

[24]     Numerous bankruptcy cases decided under §523(a)(8) prior to Brunner refer to student loans with a ten (10) year repayment period.  See, e.g., In re Geehan, 59 B.R. 600, 602 (Bankr. S.D. Ohio 1986) (student loans repayment period is "usually ten years"); see also In re Nunn, 788 F.2d 617, 618 (9th Cir. 1986); Matter of Marion, 61 B.R. 815, 817 (Bankr. W.D. Pa. 1986); In re Gibson, 45 B.R. 783, 785 (Bankr. N.D. Ga. 1985); Matter of Hawkins, 33 B.R. 908, 912 (Bankr. S.D.N.Y. 1983); In re Hartung, 24 B.R. 850, 851 (Bankr. N.D. Ohio 1982); In re Crumley, 21 B.R. 170, 171 (Bankr. E.D. Tenn. 1982); In re Brown, 4 B.R. 745, 746 (Bankr. E.D. Va. 1980); Matter of Bruce, 3 B.R. 77, 78 (Bankr. N.D. Ill. 1980).

[25]     See 34 C.F.R. §§682.209(a)(6)(ix), (a)(7)(i); id. §§682.215(f)(1), (f)(2); id. §§685.208(d)(1), (e)(1); id. §685.209(a)(6)(i)-(iii); id. §685.221(f)(1).

virtually unknown when <u>Brunner</u> was decided,[26] have become widely available.[27]

The third development has been a material change in the student loan market, including the enormous growth in the amount of student loan indebtedness. As the concurring opinion in <u>Roth</u> observed:

> [When <u>Brunner</u> was decided], bankruptcy courts only infrequently dealt with student loan discharge issues, and . . . the amounts in controversy were usually modest. As a practical matter, if a student loan was excepted from discharge, the debtor could be expected to repay it within a reasonable time.
>
> But things are different now. Unlike the loans made mostly to traditional students by local banks and colleges in the 1970s, today, a variety of lenders now compete to provide "financial assistance" for a broad assortment of study and training, without regard to the wisdom of a student's decision to borrow or their particular circumstances, and with nary a thought given to the borrower's ability to repay the debts. Today, facing the mammoth costs of a modern education, nearly all students must borrow heavily to finance their futures. Much of that student loan debt is not incurred to finance a traditional college education, but instead goes to pay for other types of training, frequently delivered by "for-profit" companies, which may not significantly improve the debtor's chances for employment or substantial earnings. . . . [I]t is not surprising that many of the students who borrowed to finance their education and training did not complete those programs. It is also hardly surprising that the proportion of student loans that are delinquent is at near-record high levels.

<u>Roth</u>, 490 B.R. at 922 (Pappas, J., concurring).

As the above quoted passage from the <u>Roth</u> concurrence suggests, the magnitude of the

---

[26]       The income contingent repayment plan was first authorized by Congress in the Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, §455(d)(1), 107 Stat. 312, 348 (1993). It was not until 1998 that reported §523(a)(8) bankruptcy court dischargeability decisions made reference to income contingent repayment plans. <u>See</u> In re Rose, 227 B.R. 518, 521 (W.D. Mo. 1998), <u>aff'd in part, remanded in part</u>, 187 F.3d 926 (8th Cir. 1999); <u>In re Thomsen</u>, 234 B.R. 506, 509-10 (Bankr. D. Mont. 1999). The earliest such reference in this district was in 2002. <u>See</u> In re Newman, 304 B.R. 188, 195 (Bankr. E.D. Pa. 2002).

[27]       <u>See</u> *https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven* (website of Federal Student Aid Office of the U.S. Department of Education stating "[m]ost federal student loans are eligible for at least one income-driven repayment plan").

debt carried by individual student loan borrowers,[28] as well as the overall amount of the

outstanding student loan debt in the United States, has increased dramatically since Brunner was

decided.

> Student loan debt in the United States grew from approximately $240 billion to over $1 trillion in the ten years between 2003 and 2013 and currently sits at more than $1.25 trillion. . . . Student loan debt is the largest form of American consumer debt aside from mortgages, surpassing both auto loans and credit card debt, and is the only form of consumer debt that has grown since overall consumer debt peaked in 2008.

Anne E. Wells, Replacing Undue Hardship with Good Faith: An Alternative Proposal for

Discharging Student Loans in Bankruptcy, 33 Cal. Bankr. J. 313 (2016); accord Rendleman &

Weingart, supra, at 216.[29]

There are at least three (3) "takeaway" points to be drawn from the above recitation of

Brunner's historical context and the changes in the landscape since it developed the §523(a)(8)

undue hardship test in 1987.

First, in amending 11 U.S.C. §523(a)(8) to eliminate the objective, temporal test for

student loan discharge, Congress left untouched the statutory term "undue hardship." Because

---

[28]    See Cushing v. Student Loan Mktg. Ass'n, 2016 WL 5390644, at *2 (E.D. Pa. Sept. 27, 2016) (observing that the average U.S. college graduate entered the workforce with over $37,000 in student loan debt); see also Doug Rendleman & Scott Weingart, Collection of Student Loans: A Critical Examination, Wash & Lee J. of Civil Rts. & Soc. Just. 215, 216 (2014) (stating in the for-profit sector, an average student borrows $39,950.00).

[29]    In light of these changes, some judges have urged the courts of appeal to reevaluate the Brunner test. See Roth, 490 B.R. at 923 (Pappas, J. concurring); In re Bene, 474 B.R. 56, 74-75 (Bankr. W.D.N.Y. 2012) (predicting that the Second Circuit would modify the Brunner test based on various changes since 1987, and applying a modified version of Brunner, but also holding that the debtor satisfied the traditional Brunner test). As expressed in Part VII, infra, I do not join these courts in calling for a modification of the Brunner test.

Brunner and other courts already construed that statutory term, it is fair to infer that by removing

the temporal discharge from the statute, Congress intended no change in the standards to be

applied by the courts in determining an undue hardship under §523(a)(8), with most Circuits

following the Brunner standard and courts in two (2) Circuits[30] employing the similar "totality of

the circumstances" test.

Second, and significantly, throughout all of these legislative adjustments to §523(a)(8), the

Brunner test has always included its own temporal limitation on the nondischargeability of student

loan debt ("**a significant portion of the repayment period**").  As a result, the net effect of the

deletion of the temporal discharge from §523(a)(8) was to eliminate the objective, fixed "passage-

of-time" basis for the discharge of student loan debt, while leaving in place, untouched, the undue

hardship test that includes its own, more case-specific, temporal test.

As construed in Brunner, the undue hardship test imposes a higher burden to discharge

than the temporal discharge.  Undue hardship requires the debtor to show substantial financial

distress, a requirement not included in the repealed temporal discharge.  Undue hardship also

requires a showing that the financial distress will persist.   However, that second requirement, the

persistence of the financial distress, **is finite**. It need continue only for a certain time period: **a**

**significant portion of the repayment period**.  The parameters of the time limitation and the

standards for measuring a "significant portion of the repayment period" are not clearly described

in Brunner, but the existence of the temporal limitation is unmistakably part of the Brunner undue

hardship test for student loan dischargeability.

---

[30]      See In re Long, 322 F.3d 549, 553-54 (8th Cir. 2003); In re Bronsdon, 435 B.R. 791,
800 (1st Cir. B.A.P. 2010).

<u>Brunner</u>'s inclusion of a time limitation in establishing the parameters of undue hardship is best understood as Congress' resolution of the competing policies embodied in §523(a)(8): the prevention of abuse and the protection of the financial stability of the student loan program, on the one hand, and the fresh start purposes of the Bankruptcy Code, on the other hand.  Congress' concern about bankruptcy abuse and the financial stability concerns easily could have led Congress to establish an absolute exception to discharge for student loans.  But Congress chose not to go that far.  Instead, it tempered the student loan exception by requiring debtors to establish that nondischargeability would impose undue hardship and all three (3) of the <u>Brunner</u> prongs promote the anti-abuse and student loan financial stability purposes of the discharge exception. The temporal limitation in the <u>Brunner</u> test, however, reflects and implements the competing underlying, fundamental, fresh start policy of the Bankruptcy Code for debtors acting in good faith.  See generally <u>Local Loan Co. v. Hunt</u>, 292 U.S. 234 (1934).

Thus, under <u>Brunner</u>, while discharge of student loan indebtedness is disfavored for policy reasons, §523(a)(8) does not establish an absolute, categorical dischargeability ban.  <u>Cf., e.g.</u>, 11 U.S.C. §523(a)(1)(A) (incorporating 11 U.S.C. §507(a)(8)(C)).   As one court observed,

> At bottom, the Bankruptcy Code requires Bankruptcy Courts to decide how much personal sacrifice society expects from individuals who accepted the benefits of guaranteed student loans but who have not obtained the financial rewards they had hoped to receive as a result of their educational expenditures.

<u>Bene</u>, 474 B.R. at 60 (quoting 4 <u>Collier</u> ¶523.14[2]).

I would modify the <u>Bene/Collier</u> observation only slightly, by stating that §523(a)(8) requires court to decide how much personal sacrifice society expects from individuals who accepted the benefits of guaranteed student loans **and for how long.**  After the requisite period of time, the fresh start policy of the Code becomes paramount and a debtor who cannot repay a

student loan while maintaining a minimal standard of living is entitled to discharge relief.

<u>Brunner</u> provides that a "significant portion" of the "repayment period" is that requisite time

period.[31]

Third, in light of the statutory amendments and social and economic developments,

judicial construction of 11 U.S.C. §523(a)(8) has broad ramifications. This discharge exception is

not one that affects a narrow group of debtors.  Student loan debt is far more prevalent than it was

thirty (30) years ago.  This category of debt cuts through a large swath of our society, making it

critical to find a proper balance of the competing policy interests in setting and applying the

contours of undue hardship.

---

[31]      The Court of Appeals opinion in Brunner largely mirrored the district court's opinion in
the case.  See In re Brunner, 46 B.R. 752 (S.D.N.Y. 1985).  It is worth noting that the district court
opinion equated the second prong requirement that the current inability to pay must extend for a
significant portion of the repayment period of the loan with the concept that the debtor must demonstrate
a "certainty of hopelessness," a phrase that implies that the debtor must project an unending period of
inadequate finances.  Id. at 755 (quoting In re Briscoe, 16 B.R. 128, 131 (S.D.N.Y. 1981)).

However, in stating the now classic test for measuring undue hardship under §523(a)(8),
the Brunner court did not adopt the phrase "certainty of hopelessness." Instead, the Brunner court
referred only to the requirement that the debtor's current financial difficulties continue for a significant
period of time. See Part IV.C.3., infra.  Thus, the phrase "certainty of hopelessness" carries a connotation
that vastly overstates the debtor's evidentiary burden under §523(a)(8).  The phrase "certainty of
hopelessness" has been used regularly by many courts over the years.  This was unfortunate. The phrase
is inaccurate and has led too many courts to employ it as an independent legal standard under §523(a)(8).
It is time to retire its use.

The court's ultimate inquiry, bearing in mind the competing interests embodied in 11
U.S.C. §523(a)(8), is to determine how long a debtor must live under the pressure and peril of unpaid
debt, without the ability to repay, before it rises to the level of undue hardship.  If the debtor's
circumstances are not likely to improve within that period, the court should determine the debt
dischargeable.

### 3. determination of the repayment period

To determine what constitutes a "significant portion" of the "repayment period," it is first necessary to determine the "repayment period." As stated above, the parties disagree on the length of the repayment period in this case.[32]

My research has not uncovered any reported decision that has grappled squarely with the effect of an uninvoked, but available, extended repayment term in analyzing the second prong of Brunner.[33] Rather, the reported decisions generally evaluate the consequences of the uninvoked extended, income-contingent loan term only in connection with the third prong of the Brunner inquiry - "good faith." See 62 A.L.R. Fed. 2d 545, §24 (West 2017) (collecting cases).[34]

---

[32]     In light of the elimination of the statutory temporal discharge and the development of extended term loan repayment plans since Brunner was decided, the Brunner court could not possibly have contemplated the issue presented by the parties: whether the phrase "repayment period" in the dischargeability test refers to the existing contractual loan term or to an available extended loan term Nothing in either the district court or Court of Appeals Brunner opinions provides any guidance.

[33]     Perhaps this is so because there is a tendency for courts to focus on the issue of future prospects, without much concern for the time frame. In other words, if the court perceives a potential for a meaningful improvement in the debtor's financial circumstances at any point in the future, it is likely to find the student loan debt nondischargeable under §523(a)(8). This may be a product of the application of the "certainty of hopelessness" standard. See n.31, supra.

[34]     In re Johnson, 2015 WL 795830 (Bankr. D. Kan. Feb. 19, 2015) may have come close to considering the second Brunner prong applicable repayment issue.

In Johnson, the bankruptcy court presumed that the contractual loan period of ten (10) years had already expired and opined that the duration element of prong two of Brunner might not even apply, reasoning:

> [A]t the time Brunner was decided, student loans that had been in a repayment period for a more than five years were dischargeable and, by extension, all student loans for which debtors sought discharge under undue hardship had to be in the ten-year repayment period. Of equal or greater force is that Brunner was decided at the time that all student loans were eventually dischargeable, subject
>
> (continued...)

To some extent, the Debtor's argument for use of her existing contract term invokes a

"plain language" methodology.  Her argument may be summarized in the following logical thread:

> (1) <u>Brunner</u> refers to the "repayment period;"
>
> (2) The only legally binding repayment period in this case is the contract term that ends in 2024 (the Debtor having opted, in good faith, not to enter into an extended loan repayment program);[35]
>
> (3) Therefore, the remaining term of the existing contract is the <u>Brunner</u> repayment period.

This argument is unpersuasive because it fails to consider that the three (3) prong <u>Brunner</u>

test is not textually grounded in the statute.  While the <u>Brunner</u> test has developed a talismanic

quality over the years, it is merely a judicial gloss on the statutory standard of "undue hardship."

See <u>Krieger</u>, 713 F.3d at 884.  Proper application of binding appellate precedent is not slavishly

---

[34](...continued)
>          to the five-year test.

2015 WL 795830, at *9.

The bankruptcy court did not specifically reference the available longer term income-based repayment plan available to the debtors.  Even so, this passage arguably supports the argument that the court is restricted to the actual contract term in evaluating the second <u>Brunner</u> prong.  However, the bankruptcy court decision in <u>Johnson</u> - determining the debt dischargeable - was reversed and remanded by the district court, in part, because the district court was unsure whether the finding that the loan term had expired was accurate (the creditor arguing that the subject loan actually had a thirty (30) year term) and, in part, because the district court believed that "a more searching inquiry" regarding the debtors' future prospects was necessary.  <u>In re Johnson</u>, 2016 WL 827752, at *5 (D. Kan. Mar. 2, 2016).

Without taking sides in the "debate" between the bankruptcy court and district court in <u>Johnson</u>, (it not really being a "debate," insofar as the district court outranks the bankruptcy court), neither decision fully explored the issue presently before this court.

[35]      The next step in the Debtor's argument, of course, is that the Debtor's present circumstances are not likely to change by 2024 (or any point in time one might choose in order to give meaning to the <u>Brunner</u> term "significant portion").

governed by the textualist principles employed in statutory construction. Rather, this court's

function is to construe the statute itself while remaining true to the holding of a controlling

judicial precedent. Therefore, the inquiry into the second <u>Brunner</u> prong requires a more

searching analysis than that offered by the Debtor.

There are reasonable arguments available to both sides on this issue.

The DOE's position finds some support in the nature of the subject loan agreements.

Government guaranteed student loan agreements are not conventional loan agreements between

two (2) private entities. Federally guaranteed student loans are the product of government

educational assistance programs. As such, they are subject to considerable federal regulation,

through which the original loan repayment terms are subject to modification. <u>See, e.g.</u>, Finding of

Fact Nos. 43-45 & accompanying footnotes.[36] These regulations provide options for extending

the original term of the loan, options which continue to exist for the borrower. As a result, it is

arguably too simplistic to say that the "repayment period" is strictly limited to the original

repayment term of the loan. One might fairly characterize the initial, contractual loan term of a

federally guaranteed student loan as a "conditional" repayment period, subject to modification

based on subsequent events.

At least where a debtor is entitled to invoke an extended period to repay the loan, it may be

consistent with the policies underlying 11 U.S.C. §523(a)(8) to consider the extended time period

---

[36]     Indeed, in this case, as suggested earlier, <u>see</u> n.4, <u>supra</u>, it appears that the Debtor may
have obtained certain repayment deferments shortly after the repayment period commenced. The
deferment of repayments is governed by federal regulations. <u>See generally</u>, 34 C.F.R. §§685.204,
685.205. Also illustrative of the special nature of student loan agreements is the possibility that the
borrower can invoke the right to obtain an administrative "discharge" of the obligation. <u>See generally</u>, 34
C.F.R. §685.212.

as the repayment period for purposes of the second prong of <u>Brunner</u>. In light of Congress' intent to limit access to the benefits of a bankruptcy discharge for certain student loan debts in order to prevent bankruptcy abuse and to safeguard the financial integrity of the student loan system, <u>see</u> Part III.B., <u>supra</u>, if a bankruptcy debtor is eligible to participate in an income-based, extended loan term program, it is not unreasonable to treat an available, extended loan term as the repayment period in evaluating undue hardship through the prism of the <u>Brunner</u> test.[37]

But there are weighty counter-arguments.

---

[37]     As explained in the text above, the DOE's position on this issue is quite reasonable. However, I must note that one (1) argument advanced by the DOE is troubling.

The DOE asserted that the legislative history of the 1998 legislation that repealed 11 U.S.C. §523(a)(8)'s seven (7) year discharge provision "makes clear that Congress intended <u>undue hardship determinations be measured in light of</u>" other options available to borrowers, including extended, income-contingent and income sensitive repayment options. (DOE Post-Trial Brief at 7).

The legislative history cited actually states:

> The conferees, in the effort to ensure the budget neutrality of this bill, adopted a provision eliminating the current bankruptcy discharge for student borrowers after they have been in repayment for seven years. The conferees note that this change does not affect the current provisions allowing any student borrower to discharge a student loan during bankruptcy if they can prove undue economic hardship. <u>The conferees also note the availability of various options to increase the affordability of student loan debt, including deferment, forbearance, cancellation and extended, graduated, income-contingent and income-sensitive repayment options.</u>

H.R. Conf. Rep. 105-750, 408, 1998 U.S.C.C.A.N. 404, 441 (1998).

In justifying the elimination of a debtor-protective provision from the Bankruptcy Code, the legislative history specifically states that the undue hardship provision of the Bankruptcy Code was unaffected and goes on merely to "note" the existence of other programs. In context, that reference appears to suggest that the other programs may ameliorate the potential negative effect of the legislative amendment. Nothing in this passage "makes clear" that Congress intended to "measure" §523(a)(8) undue hardship itself in light of these programs other programs. The DOE's brief distorts the meaning of the legislative history and is unreasonable.

First, to effectuate the §523(a)(8) goal of protecting the fiscal integrity of the government

guaranteed student loan programs, the borrower's loan term should be one that has a realistic

possibility of being paid off, whether in a shorter, contract term or a longer, refinanced term.

Some debtors, even if they participate in an extended term, income-contingent repayment

program, may be able to pay little or nothing over the term of the loan, with the loan balance then

being discharged at the end of the extended term.  In such a scenario, the fiscal health of the

student loan program would be negligibly affected even if the loan is discharged in bankruptcy.

The minuscule effect on government finance that results from not discharging unpayable loans is

trumped by the general bankruptcy policy of providing a debtor with a fresh start.  Thus, treating

the repayment term under <u>Brunner</u> as the lengthy twenty (20) or twenty-five (25) year term of an

extended repayment program effectuates the purpose of §523(a)(8) only if there is some concrete

basis for the court to conclude that the debtor's financial situation will likely improve sufficiently

far in advance of the end of the loan terms to permit a meaningful portion of the outstanding

indebtedness to be repaid.

Second, the need to preserve the integrity of the judicial process favors the use of the

contractual loan term rather than a lengthy extended loan term. Court cases should be decided in a

clear and comprehensible way.  Those analyzing a debtor's future financial situation under the

second prong of <u>Brunner</u> "should base their estimation of a debtor's prospects on specific

articulable facts, not unfounded optimism."  <u>Polleys</u>, 356 F.3d at 1310 (quoting

Robert F. Salvin, <u>Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be</u>

<u>Impoverished to Discharge Educational Loans?</u>, 71 Tul. L. Rev. 139, 197 (1996));

<u>see also</u> <u>In re Conway</u>, 495 B.R. 416, 422 (B.A.P. 8th Cir. 2013), <u>aff'd</u>, 559 F. App'x 610 (8th Cir.

2014).[38]  Use of a twenty (20) or twenty-five (25) year extended term as the repayment period

under Brunner arguably requires that the court predict what the debtor's circumstances will be ten

(10) or fifteen (15) years into the future.  In many cases, such determinations will be nothing more

than mere guesswork, without any reasonable degree of certitude. Such a failure to engage in a

grounded, realistic analysis not only creates the danger of an overly-strict application of Brunner,

but also raises legitimate concerns about both the integrity of the judicial decision making process,

as well as the public's perception of the process.

Third, using the contract term eliminates certain perverse incentives. The contractual term

is an actual obligation of the debtor which, like all other contracts, was undertaken voluntarily. In

this case, the DOE argues that this court should use the twenty-five (25) year term of the

REPAYE program despite the DOE's loan expert's considerable explanation about the negative

consequences of the REPAYE program for people like the Debtor.  (A.T. at 11:15-11:16).

---

[38]     As one court stated, in a decision determining a student loan debt to be
nondischargeable, in the undue hardship analysis under §523(a)(8)

> [O]ne must take the debtor in an educational-loan dischargeability proceeding
> exactly as he presents himself, vocational profile, medical condition, net worth,
> actual earnings, family responsibilities, and all. Then, one must make a
> reasonable prognostication as to the debtor's future ability to generate a
> meaningful income surplus. Hypothetically revesting past-disbursed and [past]-
> dispersed funds for the sake of a moral condemnation of the dispersion does not
> get us any further in this inquiry. **Neither does grunting about the huge
> abstract benefit of advanced educational credentials, without considering
> the realities broad and narrow: the structural limitations of crowded
> American employment markets for degreed persons in particular fields, or
> the hobbles that psychological conditions, responsibilities to dependents, or
> other undeniable day-to-day impediments may put on the ability to
> translate the credential into sustained high earnings**.

In re Lieberman, 2003 WL 21397713, at *9 (Bankr. D. Minn. June 3, 2003) (emphasis added), vacated on
other grounds, 2004 WL 555245 (Bankr. D. Minn. Mar. 4, 2004).

Because REPAYE requires loan consolidation, it results in the capitalization of accrued interest.

Capitalization means that individuals on REPAYE are now paying interest on interest.  If the

REPAYE-borrower's income does not improve within a few years, the loan can reach a kind of

"escape velocity," in which a borrower's meager income will never be applied to the original

principal and the loan balance will only grow for the next several decades.  Ultimately, the loan

expert testified unequivocally that the REPAYE program was ill-suited for this Debtor and that he

would recommend against her entry into REPAYE.  (Id. at 11:16).  The DOE asks this court to

consider the REPAYE repayment term irrespective of these adverse financial consequences (and

regardless of whether the Debtor is actually eligible for the program at this moment).[39]

By utilizing a longer repayment term, the bankruptcy court would be making the Debtor's

financial decisions for her, treating her as though she is actually on this repayment plan, while she

is still contractually obligated to make much larger monthly payments.  And, this court would not

only be making sensitive financial decisions for the Debtor, but it would also be making decisions

which were actively harmful to her financial situation, as the DOE's witness testified.  (Id.).  Even

invoking the IBR plan, which does not involve capitalization of interest, invites perverse

incentives.  If I consider the twenty (20) year IBR term, and find that the Debtor has not met her

burden of proof, she then will be obligated to repay her loan at its contract terms, with a monthly

payment she cannot afford or be subject to DOE collection efforts.  As a result, the court would

---

[39]      On the current record, the Debtor's eligibility is not clear.  The DOE's witness testified
that the Debtor is not currently eligible, but might be eligible if she consolidated her loans.  (A.T. at
11:03-11:05).

almost be compelling the Debtor to enter into the IBR program, a program that is intended to be voluntary.

Fourth, there is little reason to be concerned that use of the contract term in measuring the repayment will encourage litigation gamesmanship, i.e., intentional rejection of available, longer term payment plans in order to lower the debtor's burden of proof under the second prong. This concern is unfounded because the third prong provides a well-developed process for preventing abuse. See In re Barrett, 487 F.3d at 364–65 (debtor's refusal to enter an income-based plan bears on good faith analysis); Dorsey v. U.S. Dep't of Educ., 528 B.R. 137, 144 (E.D. La. 2015); In re Gregory, 387 B.R. 182, 187 (Bankr. N.D. Ohio 2008) (debtor's knowing refusal to investigate income-based plans showed bad faith); Crawley, 460 B.R. at 445-46 (failure to enter income-based plan is one of several factors in good faith analysis).

In my judgment, the arguments in favor of using the actual contract term outweigh the contrary arguments in this case. Therefore, I hold that notwithstanding a debtor's potential eligibility for an extended term student loan repayment program, if a debtor chose not to enter such a program in good faith, the repayment period under the second Brunner prong is the remaining contractual term of the debtor's loan.[40]

---

[40]    To some extent, this holding enhances the importance of the third prong of the Brunner test insofar as a debtor's decision to enter or not enter an extended loan repayment program impacts the application of the second Brunner prong. In this case, the DOE elected not to dispute the Debtor's good faith. Perhaps the DOE would have made a different litigation decision had it anticipated my holding regarding the repayment period under the second prong. However, in deciding the case, I must hold the parties to their tactical litigation choices.

### 4. determining the "significant portion" of the repayment period: case-by-case

Clear judicial guidance is lacking on the question of how much time constitutes a

"significant portion" of the repayment period.  In applying this part of the <u>Brunner</u> test, courts

have tended to focus on the qualitative rather than the quantitative  –  analyzing the types of

circumstances that caused the debtor's current financial difficulties, with the outcome turning on

whether the court perceives those circumstances as generally short-term or long-term in nature.[41]

To the extent that courts have addressed the necessary duration of a debtor's ongoing

financial difficulties under <u>Brunner</u>'s second prong more directly, the discussion has tended to

remain very general, with the duration requirement described in various ways.  In decreasing

degrees of severity, consider the following examples:

- it must be unlikely that the debtor "**will ever be able to**" repay the loan;[42]

- a common, but not absolutely necessary paradigm is the existence of a
  "**permanent disability**;"[43]

---

[41]    See, e.g., <u>Educ. Credit Mgmt. Corp. v. Carter</u>, 279 B.R. 872, 878-79 (M.D. Ga. 2002); <u>In re Harvey</u>, No. 11-23142 MER, 2013 WL 4478926 at *3 (Bankr. D. Colo. Aug. 20, 2013); <u>Educ. Credit Mgmt. Corp. v. DeGroot</u>, 339 B.R. 201, 213-14 (D. Or. 2006); <u>In re Chime</u>, 296 B.R. 439, 445-46 (Bankr. N.D. Ohio 2003); <u>In re Wetzel</u>, 213 B.R. 220, 226 (Bankr. N.D.N.Y. 1996); <u>In re Foley</u>, 204 B.R. 582, 584-85 (Bankr. M.D. Fla. 1996).

[42]    <u>In re Nightingale</u>, 529 B.R. 641, 651 (Bankr. M.D.N.C. 2015) (emphasis added) (quoting <u>In Re Burton</u>, 339 B.R. 856, 870 (Bankr. E.D. Va. 2006)); <u>accord</u> <u>Goforth v. U.S. Dep't of Educ.</u>, 466 B.R. 328, 338 (Bankr. W.D. Pa. 2012).

[43]    <u>Cf.</u> <u>In re Nightingale</u>, 548 B.R. 431, 435 (Bankr. M.D.N.C. 2015) (considering debtor's serious health conditions that are unlikely to "materially improve with respect to her capacity for employment" under the second prong of <u>Brunner</u>).

- current financial hardship must likely be "**long-term**;"[44]

- inability to repay must persist over an "**extended period of time**;"[45]

- the debtor's financial difficulty must persist "**well into the foreseeable future**;"[46]

- debtor's financial condition is likely to exist for a "**substantial portion**" of the repayment period.[47]

Respectfully, some of the cases employing the terms outlined above (or the like) have not been faithful to Brunner. Standards such as "ever be able" or "permanent" are inconsistent with the second prong of <u>Brunner</u> in that they fail to consider that undue hardship includes a temporal limitation. The fresh start, rehabilitative purpose of bankruptcy continues to exist, in a diluted form, inside the §523(a)(8) "undue hardship" discharge standard. It is "undue" and inconsistent with that policy to impose a lifetime yoke on bankruptcy debtors.

The other standards outlined above ("long-term;" "extended period;" "well into the foreseeable future") are more consistent with <u>Brunner</u>, but provide little concrete guidance for their application. To resolve a specific case, it is of limited utility to define "significant portion of the repayment period" as requiring that the debtor's hardship continue for some extended period of time. Such statements are little more than a tautology. The undue hardship determination

---

[44]    <u>In re Muto</u>, 216 B.R. 325, 330 (Bankr. N.D.N.Y. 1996) (emphasis added).

[45]    <u>Nightingale</u>, 548 B.R. at 434 (emphasis added) (quoting <u>Brunner v. N.Y. State Higher Educ. Servs. Corp.</u>, 831 F.2d 395, 396 (2d Cir. 1987)).

[46]    <u>In re Windland</u>, 201 B.R. 178, 182 (Bankr. N.D. Ohio 1996) (emphasis added).

[47]    <u>In re Kettler</u>, 256 B.R. 719, 723 (Bankr. S.D. Tex. 2000) (emphasis added); <u>accord Matter of Roberson</u>, 999 F. 2d 1132, 1135 (7th Cir. 1993).

requires more precision.

There is no mechanical approach or inflexible fixed length of time that constitutes a significant portion of the repayment period in every case (e.g., if the repayment period is twenty (20) years, the significant portion is ten (10) years; or if the loan repayment period is twenty-five (25) years, the significant portion is twelve (12) years). Rather, these determinations can be made only on a case-by-case basis, as part of the intensely fact-specific nature of the "undue hardship" analysis under 11 U.S.C. §523(a)(8).

In this case, there is only a very modest potential "swing" in determining the significant portion of the repayment period. The remaining repayment period is only seven (7) years. In the circumstances presented here, I will employ a "look-forward" period of five (5) years, through 2022. That represents slightly more than 70% of the remaining repayment period. By looking forward through 2022, the net effect is that, in this case, consideration of the Debtor's ability to repay the loan will extend through the approximate entire original ten (10) year loan term and a finding of dischargeability in this case will require a determination that the Debtor has been and will continue to be unable to repay the loan until the conclusion of that period.[48] This approach is fully consistent with the spirit of Brunner.

### 5.  the Debtor met her burden of proof

The Debtor met her burden of proving by a preponderance of the evidence that her

---

[48]     The characterization in the text of the "original ten (10) year loan term" is based on my inference that, having graduated in 2011, it is likely that the Debtor's repayment obligation commenced in 2012.  As stated earlier, it appears that the repayment obligation was deferred, resulting in the extension of the loan term to November 2024, rather than November 2022.  See n.4, supra.

financial situation is unlikely to improve for a significant portion of the repayment period (the next five (5) years) so as to enable her to repay her student loan while maintaining a minimal standard of living for herself and her family.

Before providing my reasoning, I acknowledge that I found this case difficult and and the decision was a close call.  The Debtor is young and healthy with an objectively decent occupation and eventual, long-term future prospects.  However, given the length of time remaining in her repayment period (7 years), her outlook in the foreseeable future (5 years) is far less favorable.  Essentially, the Debtor's ability to find gainful full-time employment is hampered by saturation of the market place in her field and the significant demands on child care for her three (3) children, which is compounded by a separation and an impending divorce.  The confluence and nature of these conditions lead me to conclude that the Debtor's financial situation will not improve materially over the next five (5) years.

To begin, the Debtor is unable to find full time employment in her field.  She provided specific, credible reasons why such options are not available. She testified that she and other recently-graduated sonographers are only employed part-time because there are not enough hours for full-time employment.  Apparently, the market is overflowing with far too many qualified vascular sonographers.[49]  (A.T. at 10:21-10:22).  Although she also makes herself available for on-call work, it is split among a large pool of sonographers.  Consequently, each sonographer can expect only a negligible amount of extra hours from emergency work.  To illustrate, the Debtor

---

[49]     The few full-time positions in vascular sonography are held by senior employees.  These full-timers will not reach retirement age for a number of years, and will not sacrifice their employment benefits by leaving before then.  The Debtor testified that no full-time employee would consider retiring for another eight (8) years.  (Id. at 10:36).

has been called in only three (3) times in three (3) years. (Id. at 10:07). Other sub-specialties of

sonography might be more consistent or lucrative, but the Debtor is not qualified to enter any of

them without returning to school for a year. (Id. at 10:22). Therefore, she is limited to seeking

employment outside of her field.

Even if the Debtor were to obtain additional hours of employment outside the field of

sonography, she barely moves the needle toward improving her financial situation. The Debtor

has encountered a scenario evocatively referred to as the "childcare squeeze." The "squeeze"

occurs when parents, especially single mothers, "find themselves 'squeezed out' of the job market

entirely, unable to earn the additional income their family requires because they cannot find jobs

that pay enough to offset soaring childcare expenses." Shannon Weeks McCormack, Overtaxing

the Working Family: Uncle Sam and the Childcare Squeeze, 114 Mich. L. Rev. 559, 562–63

(2016).

The Debtor's childcare expenses are based on her half-time work schedule – meaning she

will be off two and a half (2 ½) days per week and, therefore, not needing childcare for those days.

(A.T. at 10:12). If the Debtor obtains supplemental employment outside her field, she is unlikely

to earn a commensurate hourly rate, thus making the additional income for those extra hours a

"wash" because it will be largely offset by the increase in childcare costs. In effect, the Debtor

must remain underemployed because additional employment does not improve her net income or

her ability to repay her loans – it merely takes her away from her children as her paycheck will go

to the additional child care expenses. (Id. at 9:50). Certainly, the clearest way for the Debtor to

break free of the "squeeze" and earn more net income is to find more hours or another job in her

field of sonography which, as stated above, appears unattainable in the immediate future.

The immediate limitations on the Debtor's earning potential also put stress on the increase

in child care expenses she certainly will see in the next two (2) years when her middle child and

youngest child enter half-day kindergarten in 2017 and 2018.  This shorter day in the public

school will necessitate the Debtor to pay for "before-care" (care before the public school day

begins) and extended "after-care" (child care for the time between the end of the ½ day public

kindergarten program, as well as time after the regular public school day) on the days she is

working. (Id. at 10:14-10:17).  By 2019, all three of her children will be in full-time public school,

so child care costs will decrease because the number of hours needed after school will fall back to

the current level.  At present, that cost is $500.00 per month, but in two years, it is possible the

rate for after-care will increase.  (Id. at 10:19).

The Debtor's likely divorce in the foreseeable future also suggests that a deterioration,

rather an improvement in the Debtor's financial is situation, is more likely.  Presently, the Debtor

is separated from her husband, who sees their children "when he can."  (Id. at 10:05).  He does not

have stable housing, so he is unable to have the children for overnights.  (Id.).  However, he pays

$1,400.00 in court-ordered support and roughly $500.00 for a car, car insurance and renter's

insurance payments, as well as health insurance coverage.  However, it is reasonably likely this

scenario will change.  If her husband obtains stable housing and sees the children more regularly,

he can petition the state court for reduced support payments. And, as for the car and car insurance,

which the Debtor's husband is under no legal obligation to pay, the Debtor situation is precarious.

She needs a car to get to work and shuttle her children to day care, school and appointments, but

cannot meet those expenses on her own.  Moreover, the Debtor will need a new car in about two

(2) years and though the Debtor's husband has promised to pay for that new car, she plans to

divorce him before then.  (Id. at 10:28).  Thus, there is significant risk that the Debtor's husband

will not buy her the car after their divorce.  He also will not be able to cover her on his

employment-based health insurance.  (Id. at 10:31).

In summary, some of these cost increases in the Debtor's future are certain, or nearly

certain to occur while others, such as a possible car and insurance payments, are more speculative.

I mention them because some or all of them are likely to be relevant during the next five (5) years,

and all of these contingencies would increase the Debtor's monthly costs above her current costs.

Even ignoring the speculative costs, the Debtor's childcare costs are certain to increase for the

2017-2019 period.  Given that the Debtor is currently unable to pay on her loan without falling

below a minimal standard of living, she will certainly suffer an undue hardship when her child

care expenses increase, and her income does not.

I find the Debtor has demonstrated the kind of additional circumstances that show this

situation will persist for a significant portion of the next seven (7) years, thus sufficient to meet

the Debtor's initial evidentiary burden.

Finally, I point out that the DOE could have, but did not, offer any evidence to rebut the

Debtor's testimony - particularly regarding the labor market restrictions in the sonography field

that impair the Debtor's earning potential.  See In re Hamilton, 361 B.R. 532, 534 (Bankr. D.

Mont. 2007) (expert vocational testimony presented by defendant to rebut debtor's prong two (2)

Brunner evidence); In re Roach, 288 B.R. 437, 445 (Bankr. E.D. La. 2003) (same).  In the absence

of contrary evidence, I have credited the Debtor's testimony.[50]   On the record presented, the

Debtor has met her burden of proof on the second Brunner prong and is entitled to

dischargeable.[51]

# VII.  CODA

To some readers, parts of the above analysis may appear unorthodox and my determination

that the Debtor's student loan debt is dischargeable may seem counterintuitive.  After all, the debt

is owed by a young, healthy individual who completed her education, licensed for employment in

the healthcare field and presently working only part-time.  Therefore, I will briefly supplement

this already lengthy opinion to provide some further perspective on this case.  In doing so, I will

make four (4) points.

First, unlike some courts and commentators, I do not suggest that the Brunner test needs to

be replaced.  The three prong test is fine; it provides courts with the analytic tools needed to

separate debtors who deserve the undue hardship discharge of their student loans from those who

---

[50]     For example, it would be purely speculative for the court to infer that full-time positions
for vascular sonographers exist in the Debtor's regional labor markets.  There was no evidence presented,
by either side as to whether full-time vascular sonography positions exist in other regional labor markets.
In any event, there are sensible reasons why the Debtor would be hesitant to move.  The Debtor pays a
below-market rent of $1,400.00 each month to her mother.  This allows her to maintain a home for
herself and her three (3) young children, attend close-by schools and day care and make use of the free
childcare provided by the Debtor's mother.  If the Debtor attempted to move to reduce her housing costs,
those savings would be counterbalanced by other increased costs.

[51]     Accord In re Acosta-Conniff, 536 B.R. 326, 329 (Bankr. M.D. Ala. 2015), rev'd sub nom.
ECMC v. Acosta-Conniff, 550 B.R. 557 (M.D. Ala. 2016), district court reversal vacated and remanded
sub nom. In re Acosta-Conniff, 2017 WL 1396164 (11th Cir. Apr. 19, 2017) (nonprecedential); In re
Foley, 204 B.R. 582, 584-85 (Bankr. M.D. Fla. 1996); contra Wheeler v. Student Loan Mktg. Ass'n, 1994
WL 55764, at *5 (W.D.N.Y. Jan. 27, 1994), aff'd sub nom. In re Wheeler, 41 F.3d 1502 (2d Cir. 1994).

do not.  The first two (2) prongs appropriately focus on the debtor's financial circumstances and future prospects.  Consistent with case law under other sections of the Bankruptcy Code, the third prong's importation of a good faith requirement into the undue hardship standard provides courts with a means to prevent inequitable results when a litigant somehow literally (and superficially) appears to satisfy the statutory standards for relief when, in actuality, granting such relief is inconsistent with the fundamental bankruptcy policy goals.[52]

Second, I suggest only that courts take a fresh look at the manner in which <u>Brunner</u> is applied.  Many courts treat §523(a)(8) undue hardship cases as "all or nothing" propositions: either the debtor has some eventual prospect of a meaningful financial recovery sufficient to repay the student loan indebtedness or not.  If such an eventual prospect exists, for many courts, the debt is conclusively nondischargeable based on the second prong of <u>Brunner</u>.

But, this case illustrates that §523(a)(8), is not an "all or nothing."  The Debtor is an individual who, based on her age, education and skills, has a reasonable prospect of improving her financial situation at some eventual point in the future.   If "certainty of hopelessness" is the true §523(a)(8) litmus test, the outcome in this case is incorrect.  However, in this opinion, I have attempted to demonstrate that §523(a)(8) and the <u>Brunner</u> test were never intended to bar dischargeability based on an unlimited forecast into a debtor's future.  The real question is how

---

[52]     <u>See, e.g.</u>, <u>Perlin v. Hitachi Capital Am. Corp.</u>, 497 F.3d 364, 369 (3d Cir. 2007) (even in absence of express statutory language, chapter 7 has a "good faith" filing requirement) (citing <u>In re Tamecki</u>, 229 F.3d 205, 207 (3d Cir. 2000); <u>In re Lilley</u>, 91 F.3d 491, 496 (3d Cir. 1996) (in case decided prior to enactment of 11 U.S.C. §1325(a)(7),  holding that even in absence of express statutory language, chapter 13 has a "good faith" filing requirement); <u>see also</u> <u>Marrama v. Citizens Bank of Massachussetts</u>, 549 U.S. 365, 374-75 (2007) (construing text of 11 U.S.C. §706, which facially suggests that a  debtor's right to convert chapter 7 case to chapter 13 is absolute as subject to good faith limitation).

long must the debtor's circumstances appear unlikely to improve before the bankruptcy system

gives the debtor relief from a burdensome debt.  Particularly in light of the existence of extended

term loan repayment programs, that can be a difficult question to answer and I have suggested that

it might require determination on a case-by-case basis.

Here, I determined that the appropriate time period to be considered is the existing loan

contract term, not the potentially lengthier extended repayment plan term, because the Debtor

elected not to enter such a program in good faith.  The outcome may well be different in other

cases in which the extended loan repayment programs present a more attractive option, or for

other appropriate reasons.

Third, both conclusions critical to the outcome in this case (that the <u>Brunner</u> second prong

repayment period was relatively short and that the Debtor's situation was unlikely to improve

within that time period) were largely the product of the parties' litigation choices and the meager

record presented to the court.  The decisive factor was the application of the burden of proof and

the determination that the Debtor met that burden by a preponderance of the evidence.

Using the contract term as the repayment period turned on the Debtor's good faith in

choosing not to participate in an extended loan repayment program.  The Debtor's explanation for

that decision was reasonable and the DOE did not dispute the issue.  Furthermore, the DOE did

not develop the record regarding the potential for a particularized application of its extended loan

repayment standards for an individual, like the Debtor, whose tax return showed an adjusted gross

income that was artificial, in light of her marital separation.  Nor did the DOE flesh out the details

of the likely repayment terms of a more particularized application of its repayment standards to

someone in the Debtor's position.  Perhaps a more fulsome record would have made it more

appropriate to evaluate the Debtor's prospects over a longer repayment period.

Similarly, the Debtor presented unrebutted evidence supporting her position that, for reasons beyond her control, she could not increase her income from employment in her professional field and that, therefore, her present circumstances were likely to persist. Undoubtedly, if the Debtor worked full-time in her field, she would have sufficient income to repay her student loan without undue hardship. Or, if she lacked an acceptable explanation for not working full-time, the additional income could be attributed to her, with the same outcome, i.e., a determination of nondischargeability  The Debtor's evidence explaining her inability to work full-time may not have been overwhelming (and arguably, was a bit thin), but it was certainly credible and sufficient to support her theory under the second prong of Brunner; it made out a prima facie case.  In response, the DOE chose to present no evidence.  Some concrete evidence regarding the labor market that rebutted the Debtor's testimony easily could have affected the outcome.  See Roach, 288 B.R. at 445.

Finally, I suggest that critical analysis of this decision should separate the law from the application of the law.  In this opinion, I advance the legal proposition that proper application of the Brunner test requires adherence to the temporal limitations inherent in the test.   Separately, but with that principle in mind, I applied the Brunner test to the facts of this case.  Those two (2) aspects of the opinion are distinct and should be evaluated separately.

## VIII.  CONCLUSION

For the reasons expressed above, the Debtor has shown that failure to discharge her

student loan debt owed to the DOE would cause her and her dependents undue hardship.

Therefore, an order will be entered determining that the Debtor's student loan debt is

dischargeable under 11 U.S.C. §523(a)(8).


Date:  **June 23, 2017**          _____

                                   **ERIC L. FRANK**
                                   **CHIEF U.S. BANKRUPTCY JUDGE**