IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BETSY DEVOS, SECRETARY, UNITED STATES DEPARTMENT OF EDUCATION, : : : : Appellant, : : v. : : : KRISTIN M. PRICE, : : Appellee. : | CIVIL ACTION NO. 17-3064 Bankruptcy No. 15-17645ELF Adv. No. 16-11 |

**MEMORANDUM OPINION**

Smith, J.                                                                                                         January 24, 2018

In this bankruptcy appeal, the Department of Education ("DOE") asks the court to reverse the bankruptcy court's decision to discharge Kristin M. Price's student loans. As acknowledged by the bankruptcy judge in his thorough opinion, this is a close case and a difficult decision. Ultimately, however, the bankruptcy court improperly applied the legal standard and the court will reverse.

I.      PROCEDURAL HISTORY

On October 26, 2015, Price filed a Chapter 7 petition for bankruptcy in the United States Bankruptcy Court for the Eastern District of Pennsylvania. *In re Price*, No. 15-17645 (Bankr. E.D. Pa. 2015) (hereinafter "*Price I*"), Doc. No. 1. Although the bankruptcy court granted the petition for a discharge under 11 U.S.C. § 727 on February 4, 2016, *see id.*, Doc. No. 14, prior to the actual entry of this order on the bankruptcy docket Price initiated an adversary proceeding seeking to discharge her student loans under 11 U.S.C. § 523(a)(8). *In re Price*, Adv. No. 16-11 (Bankr. E.D. Pa. 2016) (hereinafter "*Price II*"), Doc. No. 1. The bankruptcy court held a trial on the adversary proceeding on November 7, 2016. Just over half a year later, the bankruptcy court

ruled that Price's student loans were dischargeable under section 523(a)(8). *Id.*, Doc. Nos. 49, 50.

The DOE timely appealed the bankruptcy court's ruling to this court on July 10, 2017. Doc. No. 1. The DOE filed a brief in support of reversing the bankruptcy court's decision on October 13, 2017. Doc. No. 8. Price filed her brief on November 13, 2017, and the DOE filed a reply brief on November 27, 2017. Doc. Nos. 11, 12. The court heard oral argument on December 6, 2017. Doc. No. 13. This court has jurisdiction and the matter is now ripe for adjudication. *See* 28 U.S.C. § 158(a).

## II.   FACTUAL BACKGROUND

During the adversary proceeding, the following relevant facts were presented: In 2011, Price graduated from Thomas Jefferson University with a bachelor's degree in Radiologic Science. *See* Transcript of Trial ("Tr.") at 8, *Price II*, Doc. No. 61. To attend Thomas Jefferson, Price obtained private and federal student loans.[1] *See* Joint Pre-Trial Statement at ECF p. 2 (hereinafter "JPS"), *Price II*, Doc. No. 37. Price owes the DOE $25,971.85 on her federal loans.[2] JPS at ECF p. 2. The monthly repayment on the loan was between $277 and $284 per month. *See* Opinion ("Op.") at 8, *Price II*, Doc. No. 49.

Price's financial troubles likely began when she separated from her husband in August of 2015. *See* Tr. at 26. While neither Price nor her husband have filed for divorce, they live in separate homes. *Id.* at 47-48, 12. As a result of this separation, and Price's need to find housing on her own, Price currently runs a monthly deficit and borrows money from her mother to break even each month. *See* Op. at 12. Neither Price nor her mother keeps a record of how much

---

[1] During the bankruptcy proceedings, Price reached a settlement agreement with her private loan provider (Chase Bank). Stipulated Order of Dismissal of Less than All Defs., *Price II*, Doc. No. 41. Thus, the only issue in this appeal is whether her federal student loans are dischargeable. *See* Doc. No. 1.
[2] All time references in this opinion are to events as they were at the time of the bankruptcy trial. Similarly, all facts are based on events as they were at the time of the bankruptcy trial.

2

money Price has borrowed, *see* Oral Dep. of Kristin Price at 45–46 (hereinafter "Dep."), *Price II*,[3] and Price pays back her mother out of her income tax refund each year. *See* Op. at 13.

Price's degree in Radiologic Science enabled her to sit for licensing examinations in vascular sonography and general sonography. Tr. at 8–10. She passed her vascular sonography examination in 2013, but failed her general sonography examination. *Id.* Price cannot retake her general sonography examination unless she goes back to school and obtains additional education. *Id.*

Price works twenty hours a week as a vascular sonographer at Main Line Health where she is paid $34.22 per hour. *See* JPS at ECF p. 3; Tr. at 29. In the hours when Price is not working, she watches her three children, two of whom are not yet in school and require full time day care on the days Price works. Tr. at 34–37. Additionally, because Price's husband does not have suitable housing, the children live with her. *See id.* at 12. Price and the children live in a home owned by Price's mother where Price pays $1,400 a month in rent—an amount that is below-market. *See* JPS at ECF p. 3; Tr. at 13–14.

Price's monthly take-home pay is $2,405.00. JPS at ECF p. 3. Price receives $1,400 per month in court-ordered child support from her estranged husband. *Id.* Her husband also pays $507.05 per month to cover the car payment, and car and renter's insurance. *Id.* at ECF p. 4. Price also receives health insurance through her husband.[4] Tr. at 47. All in all, the bankruptcy court found that Price has $4,312.00 available to cover her monthly expenses of $4,482.00. Op. at 11–12. Thus, she is running a monthly deficit of $170.00. *See id.*

Price has apparently been unable to obtain additional hours at Main Line Health and has been unsuccessful in her search for a full time position elsewhere. Tr. at 16–22. Based on

---

[3] While not labeled as an exhibit, Price's deposition was entered into evidence at trial. *See* Tr. at 52–53.
[4] If Price and her husband divorce, Price will likely no longer be able to participate in her husband's health insurance plan. *See* Op. at 50–51. Main Line Health offers health insurance to its employees. Dep. at 13.

3

Price's testimony at trial regarding her experiences attempting to gain full time employment as a vascular sonographer, the bankruptcy court found that the vascular sonography field is overcrowded and it is difficult for a vascular sonographer in this area to find full time employment. Op. at 10, 48. Additionally, based on Price's testimony, the bankruptcy court found that the full time vascular sonographers at Main Line Health are not scheduled to retire until 2025. *Id.* at 10.

Price has not sought part-time, lower-paying employment in another field because she is experiencing a childcare squeeze. Tr. at 23. Because her two youngest children are not in full time school, she will have to pay for childcare for any additional hours she works. *Id.* at 29–39. Price testified that if she worked full time her childcare expenses would go up $600 dollars a month. *Id.* at 14–15.

### III. STANDARD OF REVIEW

The district court reviews the bankruptcy court's factual findings for clear error and the bankruptcy court's conclusions of law *de novo*. *See In re Brightful*, 267 F.3d 324, 327 (3d Cir. 2001) ("We must accept the Bankruptcy Court's findings of fact unless they are clearly erroneous, but we exercise plenary review over legal issues."). A bankruptcy court's application of the facts to the law, *i.e.*, a bankruptcy court's legal conclusion is reviewed *de novo*. *See In re Zierden-Landmesser*, 249 B.R. 65, 69 (M.D. Pa. 2000) ("Whether discharging a debtor's student loans would impose an 'undue hardship' under 11 U.S.C. § 523(a)(8) requires a legal conclusion, which is to be reviewed *de novo*.").

### IV. DISCUSSION

Student loans are not dischargeable in bankruptcy unless paying them "would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). The Third

4

Circuit has adopted the Second Circuit's test from *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir. 1987), for determining undue hardship. *See In re Faish*, 72 F.3d 298, 306 (3d Cir. 1995) ("*Brunner* now provides the definitive, exclusive authority that bankruptcy courts must utilize to determine whether the 'undue hardship' exception applies."). To establish undue hardship a debtor must show:

> (1) that the debtor cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*In re Brightful*, 267 F.3d at 327 (citation omitted); *see also In re Faish*, 72 F.3d 298, 304–06 (3d Cir. 1995) (discussing *Brunner* test).

At trial, the true controversy—the "battle line," as the bankruptcy court put it—was over the second element. *See* Op. at 23. In fact, the bankruptcy court indicated that the DOE had conceded that Price satisfied the first and third elements. *See id.* at 19, 21. Nonetheless, the bankruptcy court analyzed the merits of the first and third elements and concluded that Price had satisfied her burden on both. *See id.* at 18–23. The bankruptcy court also concluded that Price satisfied her burden on the second element. *See id.* at 27, 47–48.

As discussed in more detail below, the court disagrees with bankruptcy court's conclusion on the second element.[5] All three elements must be satisfied to establish undue burden. *See In re Brightful*, 267 F.3d at 327. Consequently, Price's failure on the second

---

[5] The court agrees that "this case is difficult and the decision [on the second element is] a close call." Op. at 48 (alteration to original). This difficulty is compounded by the fact that the record is largely undeveloped in several crucial instances. *See id.* at 54–55. However, while the bankruptcy court faults the DOE for this deficit, *id.*, the court does not. It is Price's burden to persuade the court, by a preponderance of the evidence, of all elements of her case. The shortcomings in the record are more appropriately attributable to her failure to meet her burden than the DOE's failure to rebut.

element is outcome determinative and the court does not need to address the bankruptcy court's determinations on the first and third elements.

Regarding the second element, the presence of "additional circumstances . . . indicating that this state of affairs is likely to persist for a significant portion of the repayment period for student loans," *id.*, the bankruptcy court formulated this element as consisting of two parts:

> (1) that the debtor's present financial difficulties are likely to continue and not improve; and
>
> (2) the duration of the debtor's financial hardship will continue "for a significant portion of the repayment period of the student loans."

Op. at 23 (citation omitted).

On the first part, the bankruptcy court concluded that Price "met her burden of establishing the existence of circumstances that satisfy the first [part] of the second Brunner [element]—the likelihood that [her] financial difficulty will persist." Op. at 28 (alterations to original). The bankruptcy court found that Price's "unintended and involuntary underemployment, her marital separation and likely eventual divorce, and her obligations as the primary custodian of three (3) young children make it more likely than not that her present financial difficulties will continue—at least for some time." *Id.*

In contrast to a relatively short discussion on the first part, the bankruptcy court spent over twenty pages discussing the second part of the second element, whether "the duration of the debtor's financial hardship will continue 'for a significant portion of the repayment period.'" *Id.* at 23 (citation omitted); *see id.* at 28–52. The bankruptcy court discussed that there are two separate inquires involved here: "(1) How long is the applicable repayment period? (2) What is a 'significant portion' of that repayment period (sufficient to warrant discharge of the debtor's student loan)?" *Id.* at 28. On the first inquiry, the parties expressed substantial disagreement.

6

*See id*. at 28–29. Price argued that the applicable repayment period is "governed by her current loan contract, which is due to end in 2024" (approximately seven years from the time the bankruptcy trial was held). *Id*. at 28. The DOE, on the other hand, contended that the applicable repayment period is "twenty five (25) years, the longest repayment plan the Debtor may have under an available income contingent repayment program[]." *Id*. at 29 (alteration to original).

The parties' strenuous disagreement on this point is understandable. The length of the repayment period has serious implications for how demanding the second element is:

> The longer the repayment period, the more difficult the Debtor's evidentiary burden. It also is possible that a debtor might establish that his or her financial difficulties will not abate for a finite period that constitutes a "significant portion" of the existing contractual repayment period, but that longer term prospects, within a "significant portion" of an available extended repayment period, are more favorable. Thus, the choice of repayment period is potentially outcome-determinative in this and other cases.

*Id*.

The court agrees with the bankruptcy court's observation that the Third Circuit has not yet addressed whether the repayment period referenced in *Brunner*'s second prong can be calculated on the basis of available extended-term repayment programs. *See id*. at 37 ("My research has not uncovered any reported decision that has grappled squarely with the effect of an uninvoked, but available, extended repayment term in analyzing the second prong of Brunner."). As the bankruptcy court noted, most courts that have addressed "the consequences of [an] uninvoked extended, income-contingent loan term," have done so "only in connection with the third prong of the Brunner inquiry—'good faith.'" *Id.*

The bankruptcy court, after discussing *Brunner*'s historical context and evaluating the parties' arguments, determined that the repayment period should be based on the original contract term. *Id*. at 44. Additionally, the bankruptcy court determined that five years

7

constituted a "significant portion" of the seven years remaining on Price's original contract term. *Id.* at 47. The bankruptcy court then determined that it was more likely than not that Price's current financial troubles would persist for five years.[6] *Id.* at 28, 47–50.

The length of the repayment term as it relates to the second element of *Brunner* is a difficult question. For purposes of this decision, however, the court does not need to resolve this issue. Even on the shorter time period—the one applied by the bankruptcy court—Price has not met her burden of showing that it is more likely than not that she will be unable to maintain a minimum standard of living.

The bankruptcy court hinged its favorable discharge determination with respect to the second element of *Brunner* on three circumstances: (1) Price's employment situation, *i.e.*, the likelihood that Price will be unable to find full-time employment in her field in the next five years; (2) Price's childcare squeeze, *i.e.*, if Price were to obtain additional hours of employment in another field, she would not significantly improve her financial situation because the additional income earned would be offset by the additional childcare expenses she would incur; and (3) Price's likely divorce, *i.e.*, Price may lose some of the support she receives from her

---

[6] The court is doubtful that the bankruptcy court's use of "more likely than not" was correct. In *In re Brightful*, the Third Circuit explained the second element in the following way:

> Under the second element of the test, Brightful must prove that additional circumstances exist indicating that she cannot maintain a minimal standard of living for a significant portion of the repayment period if forced to repay her loans. This is a demanding requirement. As we indicated in *Faish*, it is not enough for Brightful to demonstrate that she is currently in financial straits; rather, she must prove "a total incapacity ... in the future to pay [her] debts for reasons not within [her] control." In other words, "dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment."

267 F.3d 324, 328–29 (2001) (citations omitted). It is difficult to read this passage as merely setting up a more likely than not standard. All of the language in this passage indicates that the likelihood must be high: "this is a demanding requirement," "total incapacity," "certainty of hopelessness," etc. While the court anticipates that the Third Circuit will at some point define more precisely the level of likelihood required to satisfy the second element, the court does not need to resolve that question in this case. As explained below, Price has not met her burden, as formulated by the bankruptcy court, of showing that it is more likely than not that she will be unable to maintain a minimal standard of living for a significant portion of the repayment period.

8

estranged husband once they are divorced. *See id*. at 47–52. The court will address each of these three circumstances in turn.

The first circumstance is the most crucial one: whether or not Price will be able to find additional employment in her field in the future. On this point, the bankruptcy court did not fully analyze the likelihood of Price's ability to find employment for the next five years. *See id.* at 48. The bankruptcy court merely noted that the vascular sonography employment market is currently saturated and that the full-time sonographers at Main Line Health are not set to retire for eight years. *Id*. at 48–49. These two facts are not enough to show that it is likely that Price will be unable to find full-time employment in her field in the future. On this record, the court is not persuaded that Price's current employment circumstances are likely to persist. The record is bereft of numerous facts that would be needed make that determination.

For example, the record lacks any evidence of Price's chances of finding full-time employment with a different employer in the future. Price testified that there are currently no open full-time positions at other employers because the market is saturated, but she did not provide any testimony regarding employment opportunities at these places in the future.[7] *See* Tr. at 16–22. Similarly, the record does not contain information regarding the level of saturation in the market or the likelihood that it will persist. The bankruptcy court seems to assume that because the vascular sonography employment market is currently saturated it will remain saturated for the next five years. This assumption is not supported by sufficient evidence in the record. Just because the market was saturated at the time of the trial, does not lead to the conclusion that it will be saturated over the next five years.

---

[7] The court is skeptical of the bankruptcy court's findings regarding the vascular sonography employment market in the area. The bankruptcy court based its employment market findings *solely* on Price's personal testimony. Price, however, was not offered as an expert witness. Moreover, her lay testimony based on her personal experience contained very few details. For example, it is unknown which positions she applied for; how many positions she applied for; where she applied; or when she applied.

9

The bankruptcy court faults the DOE for this information deficit in the record. *See* Op. at 51 ("Finally, I point out that the DOE could have, but did not, offer any evidence to rebut the Debtor's testimony—particularly regarding the labor market restrictions in the sonography field that impair the Debtor's earning potential."). But the burden of persuasion is on Price. At the very least, it is her burden to persuade the court that it is more likely than not that her employment troubles are likely to persist. On this first circumstance, she has not shown a likelihood that she will be unable to find additional employment in her field for the next five years.

The second circumstance is Price's childcare costs relative to additional hours she works. On this point, the bankruptcy court explained that

> [e]ven if the Debtor were to obtain additional hours of employment outside the field of sonography, she barely moves the needle toward improving her financial situation. The Debtor has encountered a scenario evocatively referred to as the "childcare squeeze." The "squeeze" occurs when parents, especially single mothers, "find themselves 'squeezed out' of the job market entirely, unable to earn the additional income their family requires because they cannot find jobs that pay enough to offset soaring childcare expenses."
>
> The Debtor's childcare expenses are based on her half-time work schedule – meaning she will be off two and a half (2 ½) days per week and, therefore, not needing childcare for those days. If the Debtor obtains supplemental employment outside her field, she is unlikely to earn a commensurate hourly rate, thus making the additional income for those extra hours a "wash" because it will be largely offset by the increase in childcare costs. In effect, the Debtor must remain underemployed because additional employment does not improve her net income or her ability to repay her loans – it merely takes her away from her children as her paycheck will go to the additional child care expenses.

*Id*. at 49 (internal citations omitted).

Unfortunately, the bankruptcy court's analysis on this point appears to be flawed. More specifically, the bankruptcy court does not fully consider how future circumstances may impact

10

the childcare squeeze Price currently experiences. The extent of the bankruptcy court's analysis on this point is as follows:

> The immediate limitations on the Debtor's earning potential also put stress on the increase in child care expenses she certainly will see in the next two (2) years when her middle child and youngest child enter half-day kindergarten in 2017 and 2018. This shorter day in the public school will necessitate the Debtor to pay for "before-care" (care before the public school day begins) and extended "after-care" (child care for the time between the end of the ½ day public kindergarten program, as well as time after the regular public school day) on the days she is working. By 2019, all three of her children will be in full-time public school, so child care costs will decrease because the number of hours needed after school will fall back to the current level. At present, that cost is $500.00 per month, but in two years, it is possible the rate for after-care will increase.

*Id.* at 50 (internal record citations omitted).

On this record, this court cannot conclude that it is likely that Price's current childcare squeeze will persist for the next five years. The bankruptcy court correctly notes that Price's childcare costs will rise until 2019 when all three of her children are in full time public school. *Id.* However, in 2019, it is likely that the childcare squeeze Price was experiencing will diminish significantly. At the time of the trial, Price would have had to pay for an additional two-and-a-half days of childcare for her two youngest children if she worked full time. *See* Tr. at 33. Her two youngest children were not in school yet and *any* time that Price spends working is time that Price needs to find childcare for her two youngest children. *Id*. at 29–39. But in 2019, she will not have to pay for two-and-a-half days of childcare. She will only have to pay for childcare for the times on those days when her youngest children are not in full-time school. *Id*. at 38. Thus, if Price were to work full time in 2019, those additional employment hours would be offset by some childcare expenses, but not as many as they currently would. The bankruptcy court did not consider this in the analysis.

11

Finally, the bankruptcy court concluded that "the [d]ebtor's likely divorce in the foreseeable future also suggests that a deterioration, rather [than] an improvement in the Debtor's financial [] situation, is more likely." Op. at 50 (alterations to original). The bankruptcy court was concerned that Price's husband would cease his voluntary payments of just over $500.00 per month after he and Price are divorced. *See id.* at 50–51. The court disagrees with the bankruptcy court's analysis on this point. The evidence does not show that the mere fact of divorce—which according to Price's testimony is likely no more than a formality at this point—will trigger a change in her husband's attitude toward supporting Price and their three children. *See* Tr. at 11. Moreover, the burden is on Price to show that her difficult circumstances will persist or worsen and she has not offered sufficient evidence to show a likelihood that the voluntary payments she receives from her husband are likely to cease or significantly diminish.

Similarly, the bankruptcy court was concerned that if Price and her husband divorce, Price will lose the healthcare she currently receives from her husband. *See* Op. at 50–51. This concern is likely overplayed. If Price and her husband divorce, and if Price loses the healthcare she currently receives, she can get healthcare coverage through Main Line Health.[8] *See* Dep. at 13.

Regarding the court-ordered payments of $1,400 per month in child support, the bankruptcy court was concerned that "[i]f her husband obtains stable housing and sees the children more regularly, he can petition the state court for reduced support payments." Op. at 50 (alteration to original); *see* Tr. at 44. But the bankruptcy court does not consider the offsetting

---

[8] The court acknowledges that, because Price's husband currently covers healthcare, *see* Tr. at 47, if Price were to get healthcare through Main Line Health this may be an additional monthly cost she would incur. However, there is no information in the record regarding the likelihood of this happening. That is, there is no information to help the court determine whether her husband would *actually* cease covering this cost if it shifted to Price. Moreover, there is no information regarding the amount of this cost (either under the husband's plan or one of Main Line Health's plans).

12

positive effect that a change in the husband's housing would have on Price's financial situation. Specifically, if her husband obtains stable housing then her childcare costs will likely decrease. Thus, the childcare squeeze noted above would be even further reduced. Consequently, any concern that Price's child support payments may decrease is likely mitigated by the positive impact on her childcare payments.

Considering these facts as a whole, the court cannot conclude that it is more likely than not that Price will be unable to maintain a minimal standard of living for the next five years. There is not a likelihood that (1) she will be unable to find additional employment in her field; (2) her childcare squeeze will persist; or (3) the support she receives from her husband will cease or decrease. Instead, there are only *possibilities* that these situations could occur, and there is a very good chance, perhaps even a likelihood, that her childcare squeeze will *shrink*. These circumstances are insufficient to establish that it is more likely than not that Price's financial difficulties will persist for five years.

## V.     CONCLUSION

The Bankruptcy Code permits a bankruptcy court to discharge a student loan debt only if the debtor can show that repayment of the loan would cause her an undue hardship. 11 U.S.C. § 523(a)(8). Price recognizes that this is a "heavy burden" for her to satisfy. *See* Appellee Kristin M. Price's Br. in Opp. to Reversing the Bankr. Ct.'s J. to Discharge her Fed. Student Loans at 1, Doc. No. 10. Although the court recognizes that Price faces difficult circumstances in repaying her student loans, she has failed to satisfy this heavy burden.

For the foregoing reasons, the court determines that Price has failed to show that it is more likely than not that she will be unable to maintain a minimal standard of living for a significant portion of her loan term. Accordingly, she has failed to satisfy the Third Circuit's test

13

for showing undue burden and her student loans are not dischargeable under 11 U.S.C. § 523(a)(8). The bankruptcy court's decision discharging debtor's student loans is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion.

    The court will enter a separate order.

                                                           BY THE COURT:

                                                /s/ *Edward G. Smith*
                                                EDWARD G. SMITH, J.